## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THE MILLTOWN-FORD AVENUE
REDEVELOPMENT AGENCY,

      Plaintiff,

      v.

SB BUILDING ASSOCIATES, L.P., *et al.*,

      Defendants.

Civil Action No. 19-21494 (RK) (RLS)

**OPINION**

**KIRSCH, District Judge**

    This matter comes before the Court upon the parties' four Motions *in Limine* filed in advance of trial in this matter set for September 4, 2024. Defendants SB Building Associates, L.P., SB Milltown Industrial Realty Holdings, LLC, and Alsol Corporation (together, "SB Building") have filed one consolidated Motion, (ECF No. 188), and Plaintiff Milltown-Ford Avenue Redevelopment Agency (the "Agency") has filed three separate Motions, (ECF Nos. 189–191). The parties filed their respective opposition briefs. (ECF Nos. 194–197.)[1]

    In May 2024, the parties presented five days of testimony from seven witnesses whose testimony is challenged in whole or in part. On May 22, 2024 the Court inspected the property subject to the parties' dispute accompanied by the parties' attorneys, and on May 30, the Court heard oral argument on the Motions *in Limine*.[2] The parties subsequently agreed to mediate the matter before the Honorable Garrett E. Brown, U.S.D.J. (ret.) in June, which was unsuccessful.

---

[1] Defendants Cherry Tree Property, LLC, Sass Muni IV, LLC, Sass Muni V, LLC, and Sass Muni VI, LLC joins SB Building's Motion *in Limine* and opposes the Agency's Motions *in Limine*. (ECF Nos. 193, 198.)

[2] The transcripts from the six days of hearing are available on the docket. (ECF Nos. 207, 208, 209, 211, 213, 216.) Because the transcripts are numbered consecutively, the Court cites them together as "Hr'g Tr."

For the reasons set forth below, three of the four Motions *in Limine*, (ECF Nos. 188, 189, 190) are **GRANTED** in part and **DENIED** in part, and the Agency's final Motion *in Limine*, (ECF No. 191), is **GRANTED**.

## I.   <u>BACKGROUND</u>

This matter involves a contested condemnation proceeding over a 22.4-acre property owned by SB Building and located in Milltown, New Jersey (the "Property").[3] SB Building and Lawrence Berger ("Berger"), the owner and principal of SB Building, (Hr'g Tr. at 272:15–16; *id.* at 581:17–20), are sophisticated parties and highly experienced litigants.[4] The pending condemnation proceeding was filed in 2019 and is only one of multiple suits surrounding development efforts behind the Property that the parties have heavily litigated—primarily in the

---

[3] The Property in fact comprises several different lots owned by related entities, (Final Pretrial Order ("FPO"), ECF No. 171 at 8), which the Court refers to collectively as "SB Building."

[4] A cursory review of this District's docket reveals a litany of matters to which the SB Building entities are party. *See, e.g., SB Bldg. Assocs. v. Versico, Inc.*, No. 98-4202 (D.N.J. 1998) (plaintiff); *NJ Mortg. Acquisition LLC v. SB Bldg. Assocs.*, No. 01-1411 (D.N.J. 2001) (defendant and counter-claimant); *SB Bldg. Assocs. v. Borough of Milltown*, No. 07-4127 (D.N.J. 2007) (plaintiff); *United States v. SB Bldg. Assocs.*, No. 08-5298 (D.N.J. 2008) (defendant); *United States v. SB Bldg. Assocs.*, No. 09-3026 (D.N.J. 2009) (movant); *United States v. SB Bldg. Assocs.*, No. 13-380 (D.N.J. 2013) (defendant); *SB Bldg. Assocs. v. Hudson Specialty Ins. Co.*, No. 15-2245 (D.N.J. 2015) (plaintiff); *SB Bldg. Assocs. v. Atkinson*, No. 20-1252 (D.N.J. 2020) (appellant); *SB Bldg. Assocs. v. Iron Mountain Info. Mgmt., LLC*, No. 20-2954 (D.N.J. 2020) (appellant); *In re S B Bldg. Assocs.*, No. 22-4650 (D.N.J. 2022) (defendant); *SB Bldg. Assocs. v. Iron Mountain Mgmt., LLC*, No. 22-4275 (D.N.J. 2022) (appellant).

Berger is likewise no stranger to litigation, as there are numerous matters to which he is or has been a party in federal court in this District alone. *See, e.g., Berger v. B.P. Chemical Co.*, No. 89-3797 (D.N.J. 1989) (plaintiff); *City Sav. Bank v. United States Land Resources, L.P.*, No. 92-3335 (D.N.J. 1992) (defendant); *United States Land Resources, L.P. v. Phelps Dodge Copper*, No. 93-978 (D.N.J. 1993) (third-party defendant and counter claimant); *United States v. Helen Street Assocs.*, No. 94-1089 (D.N.J. 1994) (defendant); *Marine Midland Bank v. Black Horse Lane*, No. 96-2682 (D.N.J. 1996) (defendant); *Black Horse Lane Assoc., L.P. v. Dow Chemical Corp.*, No. 97-1250 (D.N.J. 1997) (plaintiff); *CB Com. Real Estate Grp., Inc., v. Superseal Mfg. Co.*, No. 98-2594 (D.N.J. 1998) (third-party defendant); *Berger v. United States*, No. 05-2795 (D.N.J. 2005) (plaintiff); *Berger v. IRS*, No. 05-3854 (D.N.J. 2005) (plaintiff); *Bruss v. Berger*, No. 07-33348 (D.N.J. 2007) (defendant); *Baier v. Princeton Office Park, L.P.*, No. 08-5296 (D.N.J. 2008) (defendant); *United States Land Resources, L.P. v. JDI Realty LLC,* No. 08-5162 (D.N.J. 2008) (plaintiff); *Wells Fargo Bank, N.A. v. 400 Blair Road Realty Holdings, LLC*, No. 10-1896 (D.N.J. 2010) (defendant); *Berger v. Edwards*, No. 15-4235 (D.N.J. 2015) (appellant); *Dirauf v. Berger*, No. 20-5601 (D.N.J. 2020) (defendant); *Valley Nat'l Bank v. Burrini's Olde World Mkt., Inc.*, No. 22-919 (D.N.J. 2022) (third-party defendant).

New Jersey Superior Court—over the past twenty years. With that preface, the Court notes that it writes for the parties and summarizes only the facts necessary to resolve the pending Motions.

### A.     THE PROPERTY AND THE STATE PROCEEDINGS

The site of the subject Property was originally developed in the mid-1800s for industrial purposes and until around 1930 housed the Michelin Tire and Rubber Co. (FPO at 9.) The Property lies along two streets—Ford Avenue and Main Street—and abuts a body of water—Mill Pond, which is an impoundment of Lawrence Brook. (*Id.*) The majority of the Property lies in the "M-1" zone, which permits industrial and warehousing uses, while a small section of the Property is zoned "C-1" for commercial uses. (*Id.*) Presently, approximately one-third of the Property contains 170,000 square feet of standing industrial buildings, while the remaining two-thirds of the property contain the remnants of 400,000 square feet of former industrial buildings that have since been demolished. (*Id.*) Portions of the latter part are "covered with masonry foundations, slabs and debris remaining from the industrial buildings that were previously demolished." (*Id.*) SB Building simply demolished fifteen dilapidated, unusable, and unsafe buildings without removing tens of thousands of tons of debris which remain to date on the subject Property.

In 2001, the Borough of Milltown's (the "Borough") planning board conducted a study of the Property and recommended that the Property be designated as an "area in need of redevelopment," a recommendation the Borough's governing body approved. (*Id.* at 10.) In 2002, the Borough adopted the Ford Avenue Redevelopment Plan (the "Redevelopment Plan"), which was subsequently amended several times. (*Id.*) The most recent iteration of the Redevelopment Plan described conditions observed at the Property:

> A significant number of the buildings in the redevelopment area were in a deteriorated, dilapidated, under maintained or substandard condition. The site design exhibited poor pavement conditions as well as an antiquated site layout, which was conducive to industrial

3

> uses of the past. There had been a continued presence of vacancy, abandonment or underutilization of the property. The buildings were unsafe due to the dilapidation and have fallen into such a state of disrepair that many of the buildings are untenantable. Most of the structures have since been demolished, leaving most of the site in a vacant and unproductive condition. Remnants of previous structures, concrete, and asphalt areas remain on the property.

(Apr. 11, 2022 Revision to Milltown Ford Avenue Redevelopment Plan at 11, Ex. D to Decl. of Kevin J. O'Connor ("O'Connor Decl."), ECF No. 189-2.)[5] The Redevelopment Plan also noted that the Property abutted retail and bank locations on the Borough's Main Street and single- and multi-family residential uses as well as retail and other business operations along Ford Avenue. (*Id.* at 10–11.) The Redevelopment Plan summarized that the Borough's prior master plans had "recognized the abandonment of the industrial use of the past and recommended that a portion of the site be utilized for affordable senior housing with the remainder being designated for light industrial use." (*Id.* at 9–10.)

The Redevelopment Plan created "overlay" zoning—discussed in detail below—that permitted mixed residential use and commercial use at the Property. (FPO at 10.) In addition, the Redevelopment Plan established the Agency, an entity created to implement the redevelopment project for the Property. (*Id.* at 8.) The Agency's purpose in taking the Property was to redevelop it "for a mixed-use residential development with a component of 280 market rate housing units and 70 affordable units, together with a complementary 5,000 [square foot] commercial element and open space buffer along Mill Pond." (*Id.*) In 2004, the Agency entered into a redevelopment agreement with Boraie Development, LLC ("Boraie") to develop the Property after it was taken. (*Id.* at 10.)

---

[5] The Court notes that this description of the Property accurately characterizes the Property as the Court observed when it visited the site with the parties' attorneys on May 22, 2024.

In May 2004, SB Building filed a builder's remedy suit in New Jersey Superior Court, alleging that the Borough failed to provide a realistic opportunity for the construction of affordable housing under the *Mount Laurel* doctrine and proposing to replace Boraie as the redeveloper.[6] (*See* Opinion, *SB Building Assocs. v. Borough of Milltown*, No. MID-L-9439-06, at 2–3, 8–9 (N.J. Super. Ct. Law Div. Oct. 12, 2011) ("2011 Super. Ct. Op."), available as Ex. A to O'Connor Decl., ECF No. 189-2.) After five years of litigation and a trial, the Honorable James P. Hurley, J.S.C. denied SB Building's requested builder's remedy because, among other things, SB Building had no experience in residential development or viable plan to build affordable housing but rather was a "speculator[] looking for an approved project that can be spun off to a real builder." (*Id.* at 9.)[7] However, while the court rejected the builder's remedy, in line with the recommendation from the appointed special master, the court found that absent judicial intervention, Milltown's fair share of affordable housing "may be unjustifiably reduced" at the Property. (*Id.* at 13.) Judge Hurley therefore ordered the Borough "to amend its redevelopment plan to provide for a specific number of affordable units." (*Id.* at 13–14, 18.) Subsequent litigation—summarized in the 2023 decision of the Honorable Thomas D. McCloskey, J.S.C.—resulted in several more revisions to the

---

[6] *See S. Burlington County NAACP v. Mount Laurel Twp.*, 336 A.2d 713 (N.J. 1975) (*Mount Laurel I*) and *S. Burlington Cnty. N.A.A.C.P. v. Mount Laurel Twp.*, 456 A.2d 390 (N.J. 1983) (*Mount Laurel II*).

[7] Later in the decision, the Court noted that SB Building's proposed development plan was "excessive, ignores the problems associated with [New Jersey Department of Environmental Protection] regulations, and has been designed to produce the maximum number of units without considering good planning techniques relating to parking, internal circulation patterns and recreation." *Id.* at 13.

Judge Hurley further found that SB Building had engaged in bad faith, *id.* at 10 ("The defendants' contention that the plaintiffs brought this suit in bad faith has some merit."), noting that SB Building opted not to engage with the Borough in the redevelopment process between 2001 and 2005, *id.* ("During this entire process, plaintiffs did not appear at any stage of the process."). Judge Hurley noted that SB Building's owner, Lawrence Berger, filed the builders remedy action after he was unable to agree with Boraie on a price for the Property. *Id.* at 11. Anticipating the current condemnation proceeding, Judge Hurley noted that a builder's remedy suit could not be used as a "bargaining chip" ahead of a condemnation proceeding and that SB Building's purpose in its suit was "to achieve a litigation advantage, not to advance the public interest." *Id.*

Redevelopment Plan and several further decisions in the New Jersey Superior Court. (*See* Opinion,

*SB Building Assocs., L.P. v. Planning Bd. of the Borough of Milltown*, No. MID-L-6083-22, at 6–

13 (N.J. Super. Ct. Law Div. May 22, 2023), available as Ex. E to O'Connor Decl., ECF No. 189-

2.) The subsequent decisions affirmed Judge Hurley's order establishing the Borough's *Mount*

*Laurel* obligations. (*Id.*)

## B.  PROCEDURAL HISTORY

The Agency filed the condemnation complaint in New Jersey Superior Court on November

22, 2019, (ECF No. 1-2), which the United States of America—a named Defendant in the action

because it held federal liens against the Property—removed to this Court, (ECF No. 1). In 2020,

the Court entered the parties' Consent Order recognizing that the Agency is authorized to and has

duly exercised its power of eminent domain in the Property. (ECF No. 39.) Pursuant to the

procedures set out in the New Jersey Eminent Domain Act of 1971, N.J. Stat. Ann. §§ 20:3-1, *et*

*seq.*, the commissioners appointed to examine and appraise the Property filed their report on

August 16, 2021, (ECF No. 65), and all parties appealed the report's findings to the District Court

with the demand for a jury trial on the Property's valuation, (ECF Nos. 73, 74, 76, 78).

On April 12, 2024, the parties filed several motions *in limine* challenging the experts and

evidence the parties indicated they would present at trial. The Agency filed three separate motions

challenging four of SB Building's experts' opinions in whole or part: George Ritter ("Ritter"),

Christopher Otteau ("Otteau"), Ronald Petillo ("Petillo"), and David Zimmel ("Zimmel"). (ECF

Nos. 189, 190, 191.) SB Building filed a consolidated Motion *in Limine* seeking to bar several

categories of evidence and testimony from several experts: John Barree ("Barree"), Mark Sussman

("Sussman"), and the witness from T.O. Najarian Associates, Inc. ("Najarian"). (ECF No. 188.)

The parties filed opposition briefs. (ECF Nos. 194, 195, 196, 197.)

For SB Building, Ritter is a planning expert who set out a proposal for how the Property could be most valuably developed. Otteau is an appraisal expert who opined what the Property would be worth if it were developed as Ritter proposed. Petillo is a demolition contractor who formed an opinion of what it would cost to clear more than 55,000 tons of debris strewn about the Property in order to prepare it for development. Zimmel is an industrial real estate broker whom SB Building seeks to testify broadly about the industrial real estate market in New Jersey. For the Agency, Barree is a planning expert who set forth the Agency's proposal for developing the Property, while Sussman is their appraisal expert who valued that proposal. Najarian is a demolition expert who offered a competing opinion as to the costs to clean up and prepare the Property for development.

Along with their motions, the parties also filed copies of the witnesses' reports and deposition transcripts, relevant opinions from the state Court proceedings, and various documents related to the Redevelopment Plan and the Property. The Court held hearings over five days (May 7, 8, 14, 22, and 28, 2024) in which the parties presented testimony from each of the seven challenged witnesses above, and on May 30, 2024 the Court heard argument. On May 22, 2024, the Court visited the Property and inspected the site for approximately one-and-a-half hours accompanied by the parties' attorneys and Berger.

Below, the Court summarizes the relevant portions of the challenged evidence from SB Building's four witnesses and then from the Agency's three witnesses.

### C.    SB BUILDING'S EXPERT WITNESSES

#### 1.    George Ritter

Ritter, SB Building's planning expert, is a professional planner who proposed a development plan for the Property, which SB Building's valuation expert then relied on to appraise

the Property based on how Ritter opined it could be developed. Ritter authored a six-page report dated May 20, 2022 and attached three exhibits. ("Ritter Report", Ex. G to Apr. 15, 2024 Cert. of Anthony DellaPelle ("DellaPelle Cert."), ECF No. 188-8.) Ritter is licensed in New Jersey as a professional planner and landscape architect, and he has worked for almost fifty years as a professional planner advising private clients and municipalities on planning issues. (*Id.* at 7; Hr'g Tr. at 178:12–179:6.) Ritter is currently the professional planner for Lopatcong Township in Warren Township, before which he served as the planner for the Township of Chester and Borough of Mount Arlington. (*Id.* at 180:12–181:4; Ritter Report at 7.)

In his report, Ritter explained that the 22.4-acre Property is subject to two zoning plans: the "underlying zoning" scheme that preexisted the Borough's attempts to redevelop the Property and the new "overlay zoning" scheme created along with the Redevelopment Plan. (*Id.* at 3; Hr'g Tr. at 192:7–16.) In the underlying zoning, most of the Property is located within the M-1 light industry zone and a small portion is located within the B-2 commercial zone. (Ritter Report at 1–2.) Under the Redevelopment Plan's overlay zoning, which does not displace the underlying zoning, the Property can be used for mixed-use development for multi-family residential and commercial uses. (*Id.* at 3.)

Within the underlying zoning, one of the permitted uses of the M-1 zone is "warehousing of finished products and materials for distribution." (*Id.* at 2.) To build in a M-1 light industrial zone, development must meet certain "bulk requirements" related to the size of a building, the size of the lot, buffer zones along the edges of the property, and maximum percentage allowed of lot and impervious surface coverage. (*Id.*) The M-1 development must also meet off-street parking requirements equal to the greater of three spaces per 1,000 square feet of warehouse space or one parking space per two employees. (*Id.*)

Ritter's assignment was to "analyze[] the relevant zoning and planning issues" related to the Property to "determine the legally permissible use or uses that can be constructed on the Property." (*Id.* at 1.) Ritter concluded that the Property's "highest and best use, from a zoning standpoint" was to develop the Property in accordance with the underlying zoning, rather than the new overlay zoning. (*Id.*; *see also* Hr'g Tr. at 192:22–24 ("I concentrated in looking at the other option that was also permitted by right, which was to develop the site under the existing zoning that was on the tract.").) "For the purposes of [his] analysis," Ritter "divided" the Property "into three parcels" for development, which he opined could be done "in conformance with the Borough's underlying zoning districts." (Ritter Report at 2–3.) The three parcels Ritter proposes are:

- **Parcel 1** constitutes 3.7 acres in the B-2 commercial zone. (*Id.* at 3–4.) Ritter proposes building 23,700 square feet of "integrated retail development," which would include 18,700 square feet of retail stores and 5,000 square feet of restaurant space. (*Id.*) Ritter opines that this can be done meeting each of the underlying zoning requirements for the B-2 zone. (*Id.* at 4.)[8]

- **Parcel 2** constitutes 10.29 acres in the M-1 light industrial zone. (*Id.*) The parcel previously contained warehouse structures, which were demolished at some point. (Hr'g Tr. at 186:6–15, 188:1–6.) Ritter proposes building 200,000 square feet of "integrated warehouse facility for the storing of finished product and materials for distribution," which would include 26 loading docks, a box storage area for 12 trailers, and 144 on-site parking spaces. (Ritter Report at 4.)

- **Parcel 3** constitutes 8.45 acres also in the M-1 light industrial zone. (*Id.*) The parcel currently contains 170,000 square feet of warehouse space, which at the time of Ritter's report was occupied by three tenants engaged in warehouse and distribution activities as well as a dance studio. (*Id.* at 2, 4.) Based on how Ritter divided the Property, the parcel would provide parking for 45 vehicles. (*Id.* at 4–5.)

---

[8] The Agency does not challenge Ritter's proposal for developing Parcel 1, (*see generally* ECF No. 190-1), and therefore Ritter's proposal for Parcel 1 requires no further discussion.

Ritter opines that his proposal "can be developed 'As of Right' without the need for variance from the use, area, or bulk requirements . . . with the exception of onsite parking." (*Id.* at 5.)

**Parcel 2.** For Parcel 2, Ritter derived his proposal for 200,000 square feet of warehouse space by maximizing the size of the warehouse that could be built on Parcel 2 while "still comply[ing] with the Borough's bulk standards for impervious covers, for building coverage, for setbacks, that we could fit in that space." (Hr'g Tr. at 239:4–10.) Ritter acknowledges that the zoning ordinances require a 200,000 square foot warehouse to provide 600 parking spaces, while his proposal includes only 183 parking spaces for Parcel 2. (Ritter Report at 5; Hr'g Tr. at 240:3–24.)

Ritter opines that the board would likely grant a variance for the Parcel 2 parking spaces for several reasons. *First*, the B-2 zoning's requirement of three parking spaces per 1,000 square feet of buildings was based on historical manufacturing uses that "could employ large number of persons" and is "inconsistent with current standards for parking for warehousing uses." (Ritter Report at 5; *see also* Hr'g Tr. at 241:19–242:5.) Without citation to authority, Ritter states that municipal parking standards "tend to" require only one third or fewer of the parking spaces that the Borough does. (Ritter Report at 5.) *Second*, Ritter states that studies from the Institute of Traffic Engineers ("ITE") only require 78 parking spaces for a comparable space. (*Id.* at 5; *see also* Hr'g Tr. at 242:6–243:7.) *Third*, Ritter reports that in his capacity as Lopatcong Township's planner, he reviewed three warehouses, all of which received parking variances. (Ritter Report at 5–6.) *Finally*, Ritter contends that granting the variance "would promote a desirable visual environment by lessening the visual impact of the proposed building on Ford Avenue and the adjoining residential homes" and preserve additional area "for surface parking, additional landscaping, and greenery." (*Id.* at 6.)

Ritter's report contains no discussion of the standard that the Borough's board would apply in deciding whether to grant the variance and no application of that standard to Ritter's proposal. (*See generally* Ritter Report.) However, at the hearing, Ritter testified that an applicant would likely receive a "flexible C-2 variance" for the parking nonconformity. (Hr'g Tr. at 259:8–25.)[9] Ritter gave the following standard for granting a C-2 variance at the hearing:

> C variances, on the other hand, deal with issues of more of a design technical basis like the number of parking stalls, the number -- the setbacks from property lines, that type of thing. . . . For a C variance, generally, what -- in the broadest sense, the request for the variance has to deal with a specific piece of property, which obviously this does; that the variance being requested is not a detriment to the public good; that the relief you are asking for is -- its benefits exceed the potential negative impacts of granting the variance; and essentially that you have not created a situation that is detrimental to the township zone plan and zoning ordinance.

(Hr'g Tr. at 259:22–260:10.) Ritter testified that his proposed parking variance "will not really affect or have a negative impact on the township zone ordinance or zone plan" because the requested variance was "based on proven national standards that show that a warehouse does not require . . . this kind of parking ratio in order to support its use." (*Id.* at 260:14–261:11.) Ritter added that his proposal's inconsistency with the Borough's master plan—because the overlay zoning differs from the underlying zoning—would not affect the reviewing board's decision because the board would apply "the standards that should be applied to the use of the warehouse" embodied in the underlying zoning. (*Id.* at 262:23–263:1.)[10]

---

[9] The term "C-2 variance" derives from the subsection of the New Jersey statutes under which an applicant may seek a parking variance, N.J. Stat. Ann. § 40:55D-70(c)(2), treated in greater depth below.

[10] Asked on cross examination, Ritter agreed that an applicant for a C-2 variance would have to address "the overall nature of the neighborhood and [] how this proposed development would fit into the community and the neighborhood scheme." (Hr'g Tr. at 281:16–22.) This would include considering "the traffic, the additional truck usage, and the effect on the nature of the neighborhood and the community." (*Id.* at 283:21–284:3.)

If the variance was not granted, and to ameliorate the parking nonconformity, Ritter suggested that a developer could build a multi-level parking structure that would increase the number of parking spaces beyond 183. (Ritter Report at 6.) A drawing attached to his report depicts a structure with 76 parking spaces on the ground floor and 83 spaces on each floor above. (Ex. C to Ritter Report.) Although not treated in any depth in his report, at the hearing Ritter testified that a three-level parking structure could increase the number of parking spaces for Parcel 2 to 414 spaces while staying within the zoning's height limitation. (Hr'g Tr. at 245:1–10.) Ritter clarified in his testimony that he did not believe that all floors of the parking structure would have to be built, but rather that they could be added as needed if the board did not grant a variance for the proposal with 183 surface parking spaces. (*Id.* at 245:21–24, 263:6–10.) Ritter acknowledged that even with the 414 spaces permitted by building the parking structure, his proposal for Parcel 2 would still fall below the required 600 parking spaces and therefore require a variance. (*Id.* at 285:1–13.)

**Parcel 3.** Ritter notes that the 170,000 square feet of existing warehouse space on Parcel 3 currently contains 45 parking spaces. (Ritter Report at 4.) Ritter testified that these parking spaces have been "defined and used over there for years." (Hr'g Tr. at 216:11–16; *see also id.* at 217:1–4.) Ritter acknowledges that the zoning ordinances require a 170,000 square foot warehouse to provide more than 500 parking spaces, which is "substantially more parking than . . . the 45 spaces" provided in his proposal. (*Id.* at 226:16–20.) While Ritter's report only described 45 parking spaces for Parcel 3, at the hearing, Ritter testified that other portions of the Property ("the interior of the site") was "basically paved and used for various trucking activities" as well. (*Id.* at 217:17–25.)[11]

---

[11] Ritter acknowledged that the several times he has visited the Property, he observed "random parking on the site" with cars parked not just in the defined spots but "around the rear and side of the buildings,

Ritter opines that no variance is needed for the parking deficiency because it is a "preexisting nonconforming condition." (Ritter Report at 5.) Preexisting nonconforming conditions are conditions that "at one time were legal, but under the new codes and the new standards" are not, and "may continue on the lot because they predate the current zoning and, therefore, are grandfathered." (Hr'g Tr. at 224:25–225:5.) Although not discussed in his report, at the hearing Ritter explained that the Borough's zoning ordinances specifically provide "a grandfather clause that deals with future subdivision." (*Id.* at 227:20–228:7.) The ordinance Ritter relies on generally permits nonconforming buildings or structures that predated the ordinance's enactment. (Milltown, N.J. Mun. Code § 34-33.16 ("Milltown Code § 34-33.16"), available as Ex. F to DellaPelle Cert., ECF No. 188-7.) However, the ordinance continues that: "Land on which a nonconforming use or structure is located, and any nonconforming lot, shall not be subdivided or resubdivided so as to be made more nonconforming in any manner." (*Id.*) Ritter interprets this sentence to mean that "as long as [his proposal] didn't increase the nonconformity," he "could create the subdivision" in the Property: "you can adjust the lot lines on these types of facilities, as long as the end product does not make more variances or expands the nonconforming use on the site, you could actually modify a lot line." (Hr'g Tr. at 229:15–19; *see also id.* at 228:18–230:9.) Ritter testified that because the warehouse on Parcel 3 has existed "over the years" with nonconforming parking, the deficiency is "basically grandfathered." (*Id.* at 227:2–8.) Ritter opines that subdividing the lot to create a separate Parcel 3 does not make the parking condition more nonconforming. (*Id.* at 230:2–5.)

---

randomly parked between loading docks," and on a paved portion between the warehouse buildings and the street. (Hr'g Tr. at 217:5–15.) Further, Ritter agreed that tenants of "the existing buildings can utilize the entire site for parking." (*Id.* at 267:23–268:1.)

At the hearing, questioning focused on whether Ritter's proposal would require subdividing the Property and thus risk the Property losing its grandfathered status based on increased nonconformity. In his report, Ritter refers repeatedly to his proposed "subdivision" of the Property. (Ritter Report at 3–5.) However, at the hearing, Ritter testified that while he considered whether the Property would need to be subdivided in order to carry out his plan, confusingly, he only divided the Property into three parcels "for convenience" of his report. (*Id.* at 200:12–16; *see also id.* at 220:3–221:5 ("There is no reason that this has to be subdivided.").) However, on cross examination, Ritter conceded that without subdivision, the parking nonconformity could not be grandfathered in. (*See id.* at 265:16–18 ("[I]f the subdivision line was taken out, it would not be a grandfathered case. . . . It would be a new site plan.").) The following exchange occurred on cross examination regarding the variances an applicant would need if the Property was not subdivided:

> Q. Well, you haven't done any of the positive/negative criteria with respect to a parking variance on Parcel 3, which is the already-existing building. You would have to do that if there was no subdivision line, correct? Because there would be, even under your interpretation, no grandfathering?
>
> A. It would be part of the same presentation to the board for the variance, the criteria.
>
> Q. Okay. So you would need a variance with respect to the entire parcel and not just for what you have told us you need for the new 200,000-square-foot building?
>
> A. If they were merged, I think you would be asking for a variance based on the entire tract.

(Hr'g Tr. at 266:8–19; *see also id.* at 266:4–7 ("But [subdivision is] not necessary because, if the lot line disappeared, we would be just talking about the same need for a variance on parking that we are here. There is no -- it would still be a variance on parking.").)

### 2.      Christopher Otteau

Otteau, SB Building's expert appraiser, evaluated the Property and prepared a Property valuation as summarized in his May 27, 2022 report. ("Otteau Report", Ex. A to DellaPelle Cert., ECF No. 188-2.) Otteau opined that as of May 1, 2022, the "highest and best use" of the Property is "for the continuation of the industrial use, and for development of the remaining portions of the property with industrial and commercial uses as permitted by zoning." (*Id.* at 2.) Relying on Ritter's proposal for subdividing the Property, Otteau valued the three parcels separately, valuing the Property as though Parcel 1 were developed for commercial uses, Parcel 2 were developed for industrial use, and Parcel 3 continued to be used for industrial use with the existing buildings. (*Id.* at 3; Hr'g Tr. at 384:7–23.) Otteau valued Parcels 1 and 2 at $3.3 million and $18 million, respectively, on the assumption that they could be developed "as of right" and valued Parcel 3 at $30.2 million. (Otteau Report at 3.) Combining the three valuations, Otteau opined the Property as worth $51.5 million. (*Id.*)

In reaching his valuation, Otteau relied on an "extraordinary assumption" regarding how the Property could be developed. An extraordinary assumption is "[a]n assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions." (*Id.* at 16.) Otteau relied on the extraordinary assumption from Ritter's May 20, 2022 report that:

> [T]he subject property can be developed with an additional 200,000 square feet of new industrial buildings and 23,700 square feet of commercial space located upon 3 acres "as of right" under the M-1 and B-2 zoning in place.

(*Id.*) Otteau was required to make this extraordinary assumption because he is not a licensed planner and was therefore unqualified to form opinions on the subject of Ritter's report. (Hr'g Tr.

at 388:4–16.)[12] Otteau's report does not discuss the parking deficiency on Parcel 3 but appears to implicitly rely on the assumption that the deficiency is a preexisting nonconforming use based on his statement that Parcel 3 "is considered a legally conforming use." (Otteau Report at 47.) Otteau testified that if Ritter's opinion regarding Parcel 2 were excluded, "the only way to value that piece of land would be on a per-acre basis with industrial land sales," which Otteau did not do. (Hr'g Tr. at 450:9–20.)

### 3.      Ronald Petillo

Petillo is the principal of Petillo Enterprises, Inc., has 50 years' experience in demolition, building construction, site preparation, and environmental remediation work, and provided a report dated May 1, 2022 in connection with this litigation. ("Petillo Report", Ex. K to O'Connor Decl., ECF No. 189-4.) Petillo's report addresses "the costs of demolition, recycling and site work to be accomplished for the redevelopment" of the Property. (*Id.* at 1.) New Jersey does not require a demolition contractor to be licensed, so Petillo holds no license related to his demolition work. (*Id.* at 565:14–567:14.) In his career, Petillo has worked on approximately 70 projects for SB Building's owner, Berger, for which he has invoiced Berger "well in excess" of $100 million. (Hr'g Tr. at 578:11–23.) Of ten unrelated legal matters in which Petillo testified as an expert witness, eight involved matters with which Berger was involved. (*Id.* at 578:25–579:13.) Petillo, who has a longstanding relationship with Berger, did not charge Berger for his time creating his report or testifying in the matter. (*Id.* at 620:20–621:2, 649:22–23.)

---

[12] At the hearing, Otteau several times obliquely suggested that he did not in fact rely on Ritter's report because an employee at his firm "has a planning background." (Hr'g Tr. at 386:10–15, 387:18–388:3, 389:8–10.) However, Otteau's report clearly stated that he relied on Ritter's report for an extraordinary assumption about the legal permissibility of Ritter's proposed development, and SB Building did not argue either in its briefing or at the hearing that Otteau's conclusions could survive intact if the Court barred Ritter's opinion.

At the hearing, Petillo testified how his company would handle a demolition job if Petillo suspected that there were asbestos at a jobsite. In that case, Petillo would hire a licensed company to conduct a survey to confirm the presence of asbestos, as Petillo's company is not qualified to do so. (*Id.* at 568:19–569:20, 622:7–14.) If the licensed company determined there may be asbestos at the demolition cite, it would take samples for testing in a laboratory. (*Id.* at 571:16–24.) If asbestos were present, a separate remediation contractor would be hired to remove the asbestos. (*Id.* at 569:6–13.) If the structure were unsafe for the remediating contractor to work, Petillo may skip the remediation step, demolish the building, and "then dispose of that [asbestos containing] material as construction debris in a licensed landfill." (*Id.* at 571:25–574:1.) Before Petillo can proceed with demolition, he needs to receive a demolition permit issued by a municipal code enforcement official. (*Id.* at 570:12–571:15.)

At Berger's request, Petillo demolished fifteen buildings covering approximately two-thirds of the Property in 2016 and 2017. (Petillo Report at 4.) Petillo testified that he carried out the demolition because municipal code enforcement officials issued a notice requiring the structures to be "either repaired or demolished" and that the identified buildings were all "unsafe." (Hr'g Tr. at 580:13–581:2.) Petillo did not charge Berger for addressing asbestos at the Property as part of his 2016 and 2017 demolition work because Petillo was "not responsible for the asbestos." (*Id.* at 586:12–24; *see also* Petillo Report at 5.)

Prior to Petillo receiving demolition permits, a certified asbestos contractor—Tiger Environmental—conducted an asbestos survey of the buildings slated for demolition and produced a report dated September 18, 2014. (*Id.*; Hr'g Tr. at 587:23–589:25; *see also* Ex. E to Petillo Report.) Of the potential asbestos-containing materials that Tiger Environmental identified and sent for testing, some were positive for asbestos. (*Id.*; *see also* Hr'g Tr. at 590:23–591:11.) Petillo's

report asserts broadly that "[a] licensed contractor removed and disposed of the asbestos identified in the Tiger Report before the demolition work was performed." (Petillo Report at 5.) While Petillo's report gives the impression that all asbestos in those buildings was remediated, at the hearing, (*id.*), Petillo clarified that the licensed contractor—identified as an entity called Rasmussen—remediated the portions of the buildings containing asbestos *other than* the roofs, because the roofs were an "unsafe structure" the asbestos contractor could not reach, (Hr'g Tr. at 592:16–593:10). After the remediation, Tiger Environmental issued an "all clear" that the abatement work on the several safe buildings was complete. (*Id.* at 594:9–19; *see also* Petillo Report at 5 ("Further, as part of the process of obtaining a demolition permit for the 2016-2017 Demolition from the Borough of Milltown, a report from Tiger Environmental was submitted to the municipality certifying that there was no remaining regulated asbestos at the buildings which were to be demolished.").)

After the partial remediation was complete, Petillo applied for the demolition permit, which was granted. (Hr'g Tr. at 593:24–595:13.) Petillo's company demolished fifteen buildings, including five that had asbestos containing materials ("ACMs") in the roof. (*Id.* at 595:22–596:21; Petillo Report at 4.) Petillo testified that he disposed of the "C&D material" from the buildings with asbestos in the roof in a certified landfill. (Hr'g Tr. at 598:23–599:17.) C&D material is "anything that had a wood – a glass window, a wood structure to it, if there were any partitions inside." (*Id.* at 599:18–601:3; *see also id.* at 651:5–10 ("[The demolition materials] got cleaned, and the C&D went offsite, which all the lumber and all the roofing materials and everything went offsite, and the masonry walls that were left where . . . the actual buildings were located.").)

While Petillo testified that he disposed of the C&D Material, he also conceded that during demolition, debris "doesn't come out crystal clean" and that there are wood, metal, garbage, and

plastic items among the concrete and brick debris, which remains in various mounds strewn about the Property. (*Id.* at 651:23–652:17.) Petillo testified that if the debris were to be crushed for re-use, it would have to be further processed to remove the C&D material. (*Id.* at 652:17–653:3.) Petillo's estimated cost to crush the debris includes the cost to remove this remaining C&D material. (*Id.* at 653:11–654:3.) Petillo also acknowledged that the material would need to be tested one final time, which has not occurred to date. (*Id.* at 653:5–10.)

Petillo opines that the concrete and masonry remaining on site from the 2016 and 2017 demolition could be crushed and turned into "recycled concrete aggregate" ("RCA"), which has "significant value for use as structural fill" for future development of the Property. (Petillo Report at 6.) Petillo estimates that it would cost $615,461 to excavate and crush the 55,951 tons of recyclable material at the Property and that it would cost $138,373 to demolish and remove the remaining non-recyclable debris. (*Id.* at 10–12; Ex. C to Petillo Report.) Petillo wrote that it would cost $797,302 for a future developer to buy and have delivered RCA and that therefore the RCA at the Property has a net positive value of $43,468. (*Id.*; *see also* Hr'g Tr. at 603:20–605:1.)[13]

---

[13] Petillo's report mentions in one line that Petillo relied in part on testing from a different company—Finog Environmental—that purportedly tested the Property's demolition debris in 2017. (Petillo Report at 6; *see also* Hr'g Tr. at 609:1–24.) However, Finog Environmental's report, appended to Petillo's report, does not mention SB Building, Berger, or Petillo and states that it is "Concrete Sampling at 50 Washington Avenue, Milltown, NJ," which is not the Property's address. (Ex. E to Petillo Report.) Asked how he knew that the testing Finog Environmental performed was on debris at the Property, Petillo responded "I saw them taking the tests of the debris. I can't tell you any more than that." (Hr'g Tr. at 610:7–16.) Petillo acknowledged that the report does not mention the Property or its address, and Petillo was unable to supply any details about the origin of the Finog Environmental report connecting it to the Property. (*Id.* at 636:2–638:20.)

Petillo's report also references, in passing, testing performed by Najarian Associates to support his belief that the debris at the site is not contaminated. (Petillo Report at 6.) However, Petillo's report does not explain what testing he relied on or how it affected his opinion, (*see generally id.*); Petillo did not mention testing by Najarian Associates at the hearing; and at his deposition he could not elaborate on how materials from Najarian Associates supported his opinion. (Dep. Tr. of Ronald Petillo at 15:7–15, Ex. L to O'Connor Decl., ECF No. 189-4.)

Petillo also renders an opinion about the cost to demolish the 170,000 square feet of remaining buildings on the Property. (Petillo Report at 12–13.) Petillo relied on a March 29, 2021 asbestos survey from Tiger Environmental, (*id.* at 5–6; *see also* Ex. E to Petillo Report; Hr'g Tr. at 608:6–20), from which he concluded that there was "minimal non-friable asbestos" in the remaining buildings. (Petillo Report at 6.) Petillo estimated that it would cost $767,412 to demolish the remaining buildings and remove the non-recyclable materials and $97,383 to excavate and crush recyclable material, but that $126,155 worth of material could be reused, for a total net cost of $738,640. (Ex. D to Petillo Report; Hr'g Tr. at 605:2–606:17.)

### 4.    David Zimmel

Zimmel is the president of a "real estate brokerage company specializing in industrial real estate," a role he has held since 1985. ("Zimmel Report", Ex. M to O'Connor Decl., ECF No. 189-4; Hr'g Tr. at 298:23–299:6.) Zimmel primarily handles industrial properties and estimates that he has worked on 4,000 to 4,500 transactions over the course of his career. (*Id.* at 300:1–16.) SB Building offers Zimmel's undated, three-page report as the basis for his opinions. (*See generally* Zimmel Report.)[14] At the hearing, Zimmel additionally testified to his experience with the Property, including twice leasing a portion of the warehouse within the past four years and attempting to sell the 173,000 square foot improved portion approximately two years ago. (*See* Hr'g Tr. at 302:13–303:1, 306:5–17, 311:22–312:7, 315:2–316:7.) Zimmel has earned over $1.4 million in commissions for the sales of eight Berger-owned properties over the past several years.

---

[14] Asked about when he wrote the report, Zimmel testified that "it was about two years ago." (Hr'g Tr. at 317:16–19.) After further questioning, Zimmel explained that he was "pretty confident" he wrote the report in 2022, but could not recall the month or part of the year. (*Id.* at 318:10–319:19.) Asked why he did not date it, Zimmel responded "I don't know why" before explaining that he dictated the report and speculating that his assistant may have neglected to date it. (*Id.* at 317:23–318:5.)

(*Id.* at 341:18–344:12.) Zimmel, who too has a longstanding relationship with Berger, also did not charge SB Building for the work on his report or his time testifying. (*Id.* at 346:15–18.)

Zimmel's report states that the value of warehouses in New Jersey has significantly increased since 2018 and that the market at the time Zimmel wrote the report was "the most extraordinary industrial real estate market" Zimmel had seen. (Zimmel Report at 1.) Zimmel wrote that the value of warehouses had "significantly increased" since 2018. (*Id.*) Zimmel attributed the value increase to the increased purchases made during the COVID-19 pandemic, low interest rates accelerating the purchase of warehouse buildings, Amazon buying up the existing supply of warehouses, the pipeline of new construction being insufficient to meet current demand, and supply chain issues with products arriving from China. (*Id.* at 1–2.)

Zimmel wrote that warehouse rents that traditionally ranged from approximately $4.50 to $7.50 per square foot were as high as $20.00 per square foot depending on the type of warehouse space. (*Id.* at 2; *see also* Hr'g Tr. at 324:1–5.) Zimmel's report does not explain how he reached these figures or his basis for crediting them. (*See generally* Zimmel Report.) Asked about their provenance at the hearing, Zimmel testified that he regularly used a commercial listing database in 2022 and that if needed to, he could use that database to generate a report of the average rents over time. (*Id.* at 324:20–325:18 ("If I went back and did a search, there was probably information that I can obtain from [the commercial database] showing what the asking rents were."); *see also id.* at 328:17–329:18 (testifying that his opinions were based on "[t]ransactions that I worked on, transactions that I am aware that other people worked on. It takes a lot of things into consideration.").) Zimmel concluded that it is "unlikely that the rate of increase in warehouse purchase prices and rents . . . will not continue to accelerate at an accelerating pace over the next few years." (Zimmel Report at 3.)

### D.   THE AGENCY'S EXPERT WITNESSES

#### 1.   John Barree

Barree, the Agency's professional planning expert, authored a September 19, 2019 report, ("Barree 2019 Report", Ex. B to DellaPelle Cert., ECF No. 188-3), and a January 3, 2023 supplemental report responding to Ritter's report, ("Barree 2023 Report", Ex. A to Apr. 16, 2024 Decl. of Kevin J. O'Connor, ECF No. 194-1.) Barree holds a master's degree in city and regional planning, is a licensed planner in New Jersey and a member of the American Institute of Certified Planners, and is a partner at Heyer, Gruel & Associates, a private consulting firm primarily serving municipal government clients. (Ex. A to Barree 2023 Report; Hr'g Tr. at 28:7–29:6.)

Barree's 2019 report "evaluates potential development alternatives for the [Property] based on both the existing underlying zoning and the Redevelopment Plan's overlay zoning. (Barree 2019 Report at 3.) Barree purports to offer an opinion on the "highest and best use" of the Property, which he defines as "the use that produces the highest value, provided that the use can be legally and physically achieved." (*Id.* at 23; Barree 2023 Report at 21.) Barree's report recounts the use history and current status of the Property, (Barree 2019 Report at 7–10),[15] the history of the Borough's redevelopment efforts for the Property, (*id.* at 4–6, 13–15, 18–22), and the underlying zoning, (*id.* at 15–17).

---

[15] Barree's description of the Property and its surroundings mirrors the Court's own observation of the Property during the site visit in May 2024. Barree's report summarizes the Property's "industrial manufacturing past that dates to the mid-19th century" but notes that "[m]any of the former industrial buildings have been demolished." (Barree 2019 Report at 10.) As of the 2019 report, the standing structures (on Parcel 2) were "either vacant or house[d] several businesses including a dance school, a distribution and logistics company, a transportation company and a cleaning company." (*Id.*) Barree describes the neighborhood adjoining the Property as "predominantly residential with a mix of one- and two-family homes and community facilities" and the abutting Main Street as containing "a mix of commercial retail and service uses interspersed with residential uses" constituting the Borough's "community commercial core." (*Id.*)

Barree opines that the Property's highest and best use is to construct, consistent with the Redevelopment Plan, "a 350-unit residential development with a commercial component" and a 100-foot open space buffer along the Mill Pond. (*Id.* at 23.) Barree offers that "[o]nly the standards in the Redevelopment Plan permit a development that is consistent with the [Superior] Court's rulings" on the Borough's *Mount Laurel* obligations. (*Id.*) Barree relies on the Superior Court's findings regarding the number of residential units and amount of commercial space that could be built in accordance with the Redevelopment Plan. (*Id.* at 24–26.) Because the Borough's proposal for the Property has been repeatedly challenged in and upheld by the Superior Court, Barree concludes that his proposal is both legally permissible and physically possible. (*Id.* at 24–27.)

Barree considers but dismisses the potential of developing the Property in accordance with the M-1 and B-2 underlying zoning, as Ritter proposes. (*Id.* at 23–30.) For the approximately 20-acre portion of the Property zoned M-1 for light industrial uses (*i.e.* Parcel 2 and Parcel 3 in Ritter's Report), Barree opines that approximately 300,000 square feet of industrial buildings could be legally built in accordance with the underlying zoning. (*Id.* at 26.)[16] Within the rubric of what is "physically possible," Barree concludes that the Property is "poorly situated" with respect to major transportation arteries and that therefore "a new large-scale industrial facility . . . is not a viable development on Ford Avenue in Milltown." (*Id.* at 28–29.) Comparing the possibility of continued warehouse use against residential development at the Property, Barree concludes that the area is "not appropriate or desirable for large-scale industrial or office uses" but that the Borough's 350-

---

[16] Barree's report states that 500,000 square feet of industrial space could be built, (Barree 2019 Report at 26), which Barree testified was a typo that should instead read 300,000 square feet, (Hr'g Tr. at 95:21–96:6). For the 2.4-acre portion of the Property zoned B-2 (*i.e.* Ritter's Parcel 1), Barree opines that "[a] commercial building of approximately 30,000 square feet could be constructed as of right." (Barree 2019 Report at 27.)

residential unit proposal was found by the Superior Court to be "realistic" and "physically possible." (*Id.* at 32.)[17]

In his 2023 supplemental report, Barree reviews and responds to Ritter's proposal for the Property. Barree opines that, contrary to Ritter's report, his proposed development could not be accomplished "as of right." (Barree 2023 Report at 6.) Barree's primary objections turn on the on-site parking proposed in Ritter's design. For the 200,000 square feet of proposed new warehouse space on Parcel 2, Barree concludes that Ritter's proposed 183 parking spaces would require a "massive deviation" below the 600 required spaces. (*Id.* at 11.) According to Barree, Ritter does not substantiate how or that a variance would be granted because Ritter's reliance on his experience in Lopatcong is irrelevant to how the Borough's board would act; recently constructed, comparable warehouses in New Jersey include significantly more parking space than Ritter proposes; and Ritter does not engage with the positive or negative criteria needed to secure a C-2 variance. (*Id.* at 11–16.) With respect to the negative criteria, Barree opines that Ritter's proposal would be detrimental to the public good because a "parking variance in effect permits a larger facility than would be permitted as-of-right," which in turn allows "increased truck traffic [that] has a detrimental health impact on its surroundings." (*Id.* at 16.)[18]

For the 170,000 square feet of existing warehouse space on Parcel 3, Barree opines that Ritter's proposed 45 spaces fall well below the 510 spaces required by ordinance. (*Id.* at 7–9, 11.) Barree writes that "vehicle parking and storage is taking place outside the boundaries of the area

---

[17] In his 2023 report, Barree notes a change to the Redevelopment Plan that "reduc[es] the maximum number of residential units to 300 while still requiring 70 affordable units," which Barree writes "reflects a continuation of the Borough's decades-long goal of replacing the former industrial site . . . with a mixed-use development . . . ." (Barree 2023 Report at 5.)

[18] Barree also notes that Ritter's proposal is inconsistent with one of the M-1 zone's purposes to "provide sufficient space" to avoid "creat[ing] noise, vibrations, . . . and other objectionable influences, such as heavy trucking." (Barree 2023 Report at 8.)

that is actively used for the businesses on the property," *i.e.* Parcel 3, and that the "operation that exists today extends beyond the area that would be available under the Ritter proposal . . . ." (*Id.* at 9.) In support of this finding, Barree cites 25 violations issued by the Borough's Code Enforcement Officer in 2022, several of which related to vehicles improperly parked and/or stored on the Property. (*Id.* at 8–9.)

Finally, Barree criticizes Ritter's proposal because it "does not consider the Borough's affordable housing obligation, nor the builder's remedy suit initiated by [SB Building]." (*Id.* at 6.) Barree writes that the Property is "one of the few locations where affordable housing is planned to be constructed in the Borough." (*Id.* at 7.) The 70 affordable units contemplated by the Redevelopment Plan would "satisfy a significant portion of the Borough's constitutional obligation." (*Id.*) Barree contends that the board would be unlikely to grant a parking variance because it would "substantially impair the Borough's Master Plan" by preventing the Borough from fulfilling its affordable housing obligations. (*Id.* at 17–18.) In short, "[t]he intention is clear through the Borough's stated plans and actions that the industrial use of the property is not intended to continue or be expanded." (*Id.* at 20.)

### 2.    Mark Sussman

Sussman is the Agency's appraisal expert who authored a July 28, 2022 report. ("Sussman Report", Ex. C to DellaPelle Cert., ECF No. 188-4.) Sussman was hired to determine the Property's market value as of a certain date of valuation. (*Id.* at 25.) To do so, Sussman physically inspected the Property, considered relevant market data, and reviewed numerous documents stemming from the state court litigation. (*Id.* at 26.) Sussman also formed an opinion regarding whether the Agency's proposal for residential development on the Property, articulated in Barree's report, was the "highest and best use" of the Property. (*Id.* at 43.)

To evaluate this, Sussman considered the four required criteria: legal permissibility, physical possibility, financial feasibility, and maximum productivity. (*Id.*) On the first three prongs, Sussman largely relied on the state court proceedings that have affirmed the viability of building a 350-unit residential development at the Property in accordance with the Redevelopment Plan. (*Id.* at 43–44.) On the fourth prong, whether such use is maximally productive, Sussman "considered the possibility that another use may currently be available that would meet the same three tests but would support a higher land value" but found no alternative proposal that was "both legally permitted and financially feasible." (*Id.* at 44.) In Sussman's opinion, development of the Property for warehouse or distribution uses, as permitted by the underlying M-2 zoning, "is unlikely due to the location of the [Property] and the [August 2021] state of the office and industrial markets in the region." (*Id.* at 38.) Sussman continues that the Property's location is "less than ideal" for warehouse and distribution uses given other warehouses' superior highway access. (*Id.*; *see also id.* at 43 ("There is less demand for the other uses permitted by zoning, i.e. industrial, warehousing or office at this location, and as a result these uses offer a less viable alternative for development.").)

Having settled on residential as the highest and best use for the Property, Sussman considered three potential "approaches to value" and applied the "sales comparison approach" as the "most appropriate method of valuation." (*Id.* at 27.) Sussman acknowledged contamination issues but appraised the Property as if it had already been remediated. (*Id.* at 40.) Sussman assumed that to carry out Barree's proposal, "all remaining buildings/structures will be demolished in connection with redevelopment of the site." (*Id.* at 48.) Therefore, Sussman applies the sales comparison approach and opines that as of August 2, 2021, the Property's value is $6,190,000. (*Id.* at 48–60.)

### 3.    Najarian Associates

T.O. Najarian Associates, Inc. is a firm that provided a demolition cost estimate for the Agency. Najarian authored two reports containing opinions relevant to the pending Motions: a December 15, 2021 report, ("Najarian Dec. 2021 Report", Ex. B to Apr. 16, 2024 Decl. of Kevin J. O'Connor, ECF No. 194-1), and a January 12, 2023 report in response to Petillo's report, ("Najarian Jan. 2023 Report", Ex. H to DellaPelle Cert., ECF No. 188-9).[19] Najarian was hired to report on "the required activities and costs to demolish all onsite structures and dispose of demolition debris in preparation of site redevelopment." (Najarian Dec. 2021 Report at 3.) Vajira Gunawardana ("Gunawardana") is the Najarian director who signed both reports on Najarian's behalf and testified for the Agency at the hearing on the pending Motions.[20]

Najarian states that the majority of structures on the Property have been "demolished to slab/grade" and includes diagrams showing the structures that have been demolished and that remain standing. (*Id.* at 3–4, 17.) The report notes that Petillo demolished a number of buildings in 2016 or 2017. (*Id.*) When Petillo demolished the buildings, he removed "some" debris from the site but "the concrete footings and slabs of the former buildings, and numerous piles of demolition debris, remain onsite." (*Id.* at 4.) A water tower, a large smokestack, and a second partially demolished smokestack remain as well. (*Id.*)

Najarian has been involved with the attempted redevelopment of the Property since it was designated for redevelopment in 2001. (*Id.*) Beginning in 2001, Najarian was the environmental

---

[19] In moving to exclude portions of Najarian's opinions, SB Building filed and cited two additional reports prepared by Najarian from September 2019 and March 2021. (*See* Exs. I & J to DellaPelle Cert.) In its opposition brief, the Agency writes that only the December 2021 and January 2023 reports are "operative." (ECF No. 194 at 30 n.8.) Therefore, the Court only discusses the latter two reports as well, and assumes the Agency will not seek to offer any testimony contained in the September 2019 or March 2021 reports that is not also contained in Najarian's "operative" reports.

[20] Because the parties in their briefing refer to "Najarian's" opinions rather than "Gunawardana's," the Court does likewise except where discussing credentials or testimony unique to Gunawardana.

engineer the Borough hired to perform environmental investigations of the Property, identify contaminants, and come up with a plan to remediate them. (Hr'g Tr. at 488:1–10.) Gunawardana, who holds a master's degree in civil and environmental engineering, has performed environmental site inspections throughout his career. (*Id.* at 487:5–22.)

Najarian's report addresses the presence and remediation of asbestos and PCB contamination at the Property. "Asbestos is commonly found in roofing materials in buildings constructed between 1900 and 1980 in the roof shingles, tar, asphalt liquids, mastic, sealant, flashing, adhesives, felts and underlayment." (Najarian Dec. 2021 Report at 6.) "PCBs were domestically manufactured from 1929 until manufacturing was banned in 1979" and were "present in caulking and elastic sealant materials, which may be found in/around windows, door frames, stairways, building joints, masonry columns, and other masonry building materials" as well as "lamp/light ballasts." (*Id.*) Najarian reviewed a 2021 report from Petillo as well as the testing Petillo relied on from Tiger Environmental from September 2014 and July 2016. (*Id.* at 5.)

The New Jersey Department of Environmental Protection ("NJDEP") set out protocols for sampling and testing for asbestos or PCBs before reusing building materials at a site, and these protocols apply to the Property. (*Id.* at 7.) Citing the NJDEP protocols, Najarian writes that for any materials intended to be used for recycling rather than disposal, the NJDEP "requires the characterization, preferably by in situ pre-demolition sampling, or post-demolition sampling, through the laboratory analysis of concrete, post-demolition concrete processing fines and brick and block" demolition sites subject to oversight, such as the Property. (*Id.*) An environmental consultant must prepare and implement "a material sampling plan and a waste management plan . . . to determine whether the building materials contain elevated levels of contaminants that require abatement and/or trigger special handling or disposal procedures, and to segregate

materials in a manner that will optimize re-use/recycling and minimize offsite disposal." (*Id.*) If testing reveals problematic concentrations of contaminants, the contaminated materials may not be used "for direct reuse or recycling on or off of the site of generation without NJDEP approval." (*Id.*)

Najarian reviewed Petillo's report on the costs for demolition and opined that Petillo underestimates the demolition costs because he failed to adequately account for contamination at the Property. (*Id.* at 8.) Najarian gives several bases for this opinion. First, "[a]n environmental consultant was not retained to coordinate and supervise the demolition activities as required by the NJDEP." (*Id.*) Second, Petillo failed to develop or implement a "material sampling plan and a waste management plan" prior to demolition, as a result of which PCBs or asbestos may be present in the building rubble, which would require disposal offsite. (*Id.*) Petillo testified that asbestos abatement was not conducted on certain roofing materials before Petillo carried out the destruction, and that therefore "all the materials in the debris piles are considered asbestos-containing waste material" that cannot be reused. (*Id.* at 8–9.) To the extent that Petillo subsequently removed asbestos-containing materials from the debris after demolition, "Petillo is not a licensed asbestos abatement contractor" and therefore "performing these activities is disallowed by regulations . . . ." (*Id.* at 9.)

Relying on Tiger's September 2014 testing report and July 2016 abatement report, Najarian compared the confirmed asbestos in the buildings with the asbestos that was actually abated and concludes that asbestos "remained in many of the buildings after the June 2016 abatement efforts." (*Id.* at 9, 27–29.) Finally, Najarian visited the Property on multiple occasions and observed "numerous [potential asbestos containing materials] . . . in the remnants of buildings and in the debris piles." (*Id.* at 10.) "The intermixing of [asbestos containing materials] with the building

rubble greatly reduces the ability to separate and categorize the post-demolition debris, thereby preventing the onsite use of the materials and prohibiting offsite recycling." (*Id.*) Najarian criticizes Petillo's "assum[ption] [that] all recyclable materials can be made into [RCA] and reused on the Site," because this would only be true "if the recyclable materials were found to be free of contaminants, which would require extensive sampling/analyses." (*Id.*) Najarian concludes that the "intermixing of [asbestos containing materials], along with potentially PCB-containing building materials, in the debris material significantly increases demolition costs." (*Id.* at 4.) Najarian summarizes his criticism of Petillo's conclusion in Najarian's 2023 report, writing that Petillo:

> assumed all recyclable materials can be made into RCA and reused on the Site, thereby reducing the amount of sub-base materials . . . required for purchase to redevelop the Site. This would be true if the recyclable materials were found to be free of contaminants, which would require extensive sampling/analyses. While the Site soils were found to contain elevated contaminants levels, primarily due to historic fill material, and the Site will be capped, the NJDEP regulates the placement and movement of contaminated materials on sites within the SRP. The Site is not a disposal facility.

(Najarian Jan. 2023 Report at 10.)

Najarian's December 2021 report incorporates a cost estimate from the DAS Group for completing demolition operations at the Property. (Najarian Dec. 2021 Report at 11.) The DAS Group's estimate is based on the assumption that completing demolition would require transporting and disposing of asbestos containing materials at the site, demolishing the remaining foundation sand slabs of previously demolished buildings, demolishing and disposing of the standing structures at the Property, and crushing clean concrete materials for reuse on the Property. (*Id.*) The DAS Group's proposal excludes costs related to asbestos testing in the remaining

buildings. (*Id.* at 11–12.) In total, the DAS Group estimated that it would cost $7,712,866 to complete demolition at the Property. (*Id.* at 13.)

## II.   **LEGAL STANDARDS**

### A.   PRINCIPLES OF JUST COMPENSATION

When a municipality takes private property for public use, it must pay "just compensation" to the property owner. *See* U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); N.J. Const. art. I, ¶ 20; *see also* N.J. Stat. Ann. § 20:3-29 ("The condemnee shall be entitled to compensation for the property . . . ."). "Where the whole of a property is taken," just compensation is calculated as "the fair market value of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act." *Comm'r of Transp. v. Silver*, 457 A.2d 463, 467 (N.J. 1983) (citing *Vill. of South Orange v. Alden Corp.*, 365 A.2d 469 (N.J. 1976)). The fair market value generally considers the property's "highest and best use," *New Jersey ex rel. Comm'r of Transp. v. Caoili*, 639 A.2d 275, 279 (N.J. 1994) (citations omitted), which is "'the use that at the time of the appraisal is the most profitable, likely use' or alternatively, 'the available use and program of future utilization that produces the highest present land value' provided that 'use has . . . a probability of achievement,'" *Hous. Auth. of New Brunswick v. Suydam Invs., L.L.C.*, 826 A.2d 673, 684 (N.J. 2003) (quoting *Cnty. of Monmouth v. Hilton*, 760 A.2d 786, 789 (N.J. Super. Ct. App. Div. 2000)).

Determining a property's highest and best use must account for whether "the use can be legally and physically achieved." *Borough of Saddle River v. 66 E. Allendale, LLC*, 77 A.3d 1161, 1174 (N.J. 2013) (citing *Hilton*, 760 A.2d at 789). This includes consideration of "any zoning restrictions that apply to the property." *Caoili*, 639 A.2d at 279. However, "[b]ecause the inquiry

into the uses of property is usually wide-ranging, 'courts in this state have shown considerable liberality in admitting evidence of market value, particularly in terms of the highest and best use of the subject property.'" *Id.* (quoting *Silver*, 457 A.2d at 467).

### B.   FEDERAL RULE OF EVIDENCE 702

The admission of expert testimony in this matter is governed by Federal Rule of Evidence 702.[21] Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. It is well-established that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Applying Rule 702, the court acts as a gatekeeper to ensure the relevance and reliability of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–95 (1993). In conducting this analysis, courts are to consider "all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the

---

[21] The parties agreed that federal procedural law and state substantive law govern these proceedings. (Consent Order, ECF No. 39.) In limited circumstances, a state's substantive law regarding admissibility of expert evidence may apply in a federal case. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 750–52 (3d Cir. 1994). However, here, the parties' briefs uniformly argue for the exclusion of the evidence based on Federal Rule of Evidence 702. (*See* ECF No. 188-12 at 32–35; ECF No. 189-1 at 5–6.) Neither party argues that application of the New Jersey Rules of Evidence would result in a different outcome here. Therefore, the Court applies the Federal Rules of Evidence.

facts and the conclusion." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)).

Under the first prong, the expert's qualifications, the expert is "qualified to render an opinion when he or she 'possesses specialized expertise.'" *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 655 (D.N.J. 2008) (quoting *Pineda v. Ford Motor Corp.*, 520 F.3d 237, 244 (3d Cir. 2008)). An expert may be qualified either through "formal education as well as a 'broad range of knowledge, skills, and training.'" *Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)). An expert does not have to "be the best qualified" or "have the specialization that the court considers most appropriate." *Pineda*, 520 F.3d at 244 (quotation omitted).

The second prong of admissibility concerns whether "the process or technique the expert used in formulating the opinion is reliable." *Pineda*, 520 F.3d at 247 (quoting *In re Paoli*, 35 F.3d at 742). This has been interpreted to mean that an "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). The court considers whether there are "good grounds" for the expert to reach an opinion, even if the court believes that "there are better grounds for some alternative conclusion" or that there are some flaws in the expert's methods. *Id.* at 744. The court's focus must be on the principles and methods, rather than on the ultimate conclusions reached. *Id.* (citing *Daubert*, 509 U.S. at 595). However, because "conclusions and methodology are not entirely distinct from one another," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), the court may conduct "at least a limited review of the expert's conclusions 'in order to determine whether they could reliably flow from the facts known to the expert and the

methodology used,'" *In re Human Tissue*, 582 F. Supp. 2d at 656 (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999)).

The third prong, fit, derives from Rule 702's requirement that expert testimony be helpful to the trier of fact. *See* Fed. R. Evid. 702(a). The Third Circuit has explained that "admissibility depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *In re Paoli*, 35 F.3d at 743 (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)).

Distinct from, but related to, Rule 702's requirements is the prohibition under New Jersey law on an expert offering a "net opinion." "Under New Jersey law, an 'expert's bare conclusions, unsupported by factual evidence' are an inadmissible 'net opinion.'" *W. Am. Ins. Co. v. Jersey Cent. Power & Light Co.*, No. 03-6161, 2008 WL 5244232, at *5 (D.N.J. Dec. 15, 2008) (quoting *Buckelew v. Grossbard*, 435 A.2d 1150, 1156 (N.J. 1981)). The rule "requires the expert to give the 'why and wherefore' of the opinion, rather than a mere conclusion." *Curtis v. Besam Grp.*, No. 05-2807, 2007 WL 3232589, at *7 (D.N.J. Oct. 31, 2007) (quoting *Rosenberg v. Tavorath*, 800 A.2d 216, 226 (N.J. Super. Ct. App. Div. 2002)). If the expert's opinion is based on "mere guess or conjecture," rather than the articulation of a "reasonably accurate conclusion," the opinion is barred under the net opinion rule. *Id.* (citing *Vuocolo v. Diamond Shamrock Chemicals Co.*, 573 A.2d 196, 202 (N.J. Super. Ct. App. Div. 1990)).[22]

---

[22] "[T]he 'net opinion' rule is neither an evidentiary rule under the Federal Rules of Evidence nor [an explicit] factor in the *Daubert* analysis." *Holman Enter. v. Fidelity & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 n.12 (D.N.J. 2008). Rather, the rule is "merely a restatement of the well-settled principle that an expert's bare conclusions are not admissible under Rule 702." *Zeller v. J.C. Penney Co.*, No. 05-2546, 2008 WL 906350, at *7 (D.N.J. Mar. 31, 2008) (citation omitted). Courts in this District routinely apply the net opinion rule in hearing a challenge to an expert's opinion under Rule 702, either as a component of *Daubert*'s "fit" requirement or more generally under the requirement that an expert's opinion "help the trier of fact," Fed. R. Evid. 702(a). *See, e.g.*, *Silipena v. Am. Pulverizer Co.*, No. 16-711, 2024 WL 3219226, at *16 (D.N.J. June 28, 2024); *Brutosky v. Stinner*, No. 20-13516, 2023 WL 6458853, at *4 (D.N.J. Oct. 3, 2023); *Alberts v. Bumgardner*, No. 13-5538, 2017 WL 3705799, at *3 (D.N.J. Aug. 25, 2017).

### III.   DISCUSSION

#### A.   THE AGENCY'S MOTIONS *IN LIMINE*

The Court addresses each of the Agency's three Motions *in Limine* and the testimony each seeks to exclude in turn, beginning with the Agency's challenge to Ritter's testimony, (ECF No. 190), and proceeding to its challenges to Petillo, (ECF No. 189), and Zimmel, (ECF No. 191). With each witness, the Court also considers whether Otteau relied on that witness's opinion to reach his own.

##### 1.   Testimony from George Ritter and Derivative Testimony from Christopher Otteau

The Agency seeks to bar the entirety of Ritter's report and testimony as well as any portion of Otteau's opinion that relies on Ritter. (ECF No. 190-1 at 35.) The Agency argues that to carry out Ritter's proposal for the Property, a developer would have to secure land use approvals, variance relief, parking variance relief, and site plan and subdivision approval. (*Id.* at 17–18.) The Agency argues that Ritter "fails to establish a reasonable probability that the variances and zoning approvals" would be granted and therefore Ritter offers an impermissible net opinion. (*Id.* at 14.)

The Agency identifies several flaws it contends are fatal to Ritter's proposal. *First*, Ritter does not establish a reasonable probability that a parking variance would be granted for the 200,000 square foot warehouse proposed for Parcel 2. (*Id.* at 19–22.) The Agency contends that Ritter improperly relies on his personal experiences with variances granted for dissimilar properties in dissimilar municipalities. (*Id.*) The Agency challenges Ritter's proposal to build an over-height parking structure on Parcel 2, arguing that the Ritter report's single-sentence mention of a parking structure provides no analysis as to why a height variance would be granted. (*Id.* at 22–24.) *Second*, the Agency contends that Ritter is wrong to claim that the current parking situation on Parcel 3 is a preexisting nonconforming condition or why, if a parking variance were needed, the approvals

would be granted. (*Id.* at 24–27.) The Agency argues that Ritter's proposal requires subdividing the Property, which would require site plan and subdivision approval from the municipal board. (*Id.*) *Third*, the Agency finds fault with Ritter for failing to account for the Borough's affordable housing obligations. (*Id.* at 27–29.)

SB Building responds that Ritter has established a reasonable probability that, if his proposal could not be developed "as of right," a nonconformity would be grandfathered in or a variance would be granted. (ECF No. 196.) SB Building contends that Ritter's 50 years of experience, his work with other municipalities, and his belief that the Borough's parking requirements are outdated adequately support his opinion that a parking variance would be granted for Parcel 2. (*Id.* at 10–13.) Regarding Ritter's proposed parking structure, SB Building responds that the Agency misunderstands Ritter's proposal because he does not propose building a structure that would require a height variance. (*Id.* at 13–14.) SB Building continues that, apart from the parking variance, Ritter's proposal for Parcel 2 could be developed "as of right" without a hostile board being able to block it. (*Id.* at 14–16.) With respect to Parcel 3, SB Building contends that Ritter's proposal is not premised on subdividing the property, that no subdivision approval is required, and that therefore the preexisting nonconforming condition of the parking deficiency would be maintained. (*Id.* at 9–10, 16–17.) Finally, SB Building contends that the property owner is not bound by constitutional obligations or court orders that fall solely on the Borough and that there is therefore no basis to exclude Ritter's testimony on that basis. (*Id.* at 18–19.)

Determining fair market value for taken property requires determining the property's "highest and best use," which in turn requires consideration of whether the use "can be legally and physically achieved." *Borough of Saddle River v. 66 E. Allendale, LLC*, 77 A.3d 1161, 1174 (N.J. 2013) (citing *Cnty. of Monmouth v. Hilton*, 760 A.2d 786, 789 (N.J. Super. Ct. App. Div. 2000)).

Thus, a property's highest and best use "must be 'considered in light of any zoning restrictions that apply to the property,' rendering zoning restrictions 'material factors in determining its fair market value.'" *Id.* at 1174 (quoting *New Jersey ex rel. Comm'r of Transp. v. Caoili*, 639 A.2d 275, 279 (N.J. 1994)). A property may be valued based on a change in zoning restrictions, "but only if there is a reasonable probability that a zoning change would be granted." *Id.* at 1163 (citing *New Jersey ex rel. State Highway Comm'r v. Gorga*, 138 A.2d 833 (N.J. 1958) and *Caoili*, 639 A.2d 275).

Under the approach articulated in *Gorga* and *Caoili*, the court applies a two-step process before permitting an opinion regarding "zoning changes in respect of the future use of a property." *Saddle River*, 77 A.3d at 1174–75. In the first step, the Court "must determine whether there is sufficient evidence to support the conclusion that a zoning change is 'reasonably probable.'" *Id.* at 1175 (quoting *Caoili*, 639 A.2d at 281). The evidence must "indicat[e] beyond a mere possibility that a change of use is likely and, further, that such a change would be an important factor in the valuation of the property." *Id.* The court performs this "gatekeeping function by screening out potentially unreliable evidence and admitting only evidence that would warrant or support a finding that a zoning change is probable." *Id.* Once the Court performs its gatekeeping function, the second step requires the jury to hear the evidence and determine whether "a buyer and seller engaged in voluntary negotiations over the fair market value of the property [would reasonably believe] that a change may occur and will have an impact on the value of the property." *Id.* While the opinion subject to judicial gatekeeping in *Caoili* addressed a zoning change, "[c]ourts have applied the *Caoili* two-step process to evaluate opinions as to valuation of property based on a variety of future changes pertaining to a parcel of property," including, in *Saddle River* itself, the likelihood of an issuance of a variance. *Id.* at 1175–76 (citation omitted).

In performing its important gatekeeping role under step one, the court must closely scrutinize the proposed expert testimony regarding the anticipated variance. In reversing the trial court's decision to permit the condemnee's experts to testify regarding the issuance of a bulk variance in *Saddle River*, the New Jersey Supreme Court explained the required showing at the first step in the *Caoili* process:

> It is not sufficient for experts to opine in conclusory fashion that such a bulk variance would have been issued in this matter without addressing all the criteria that the Board would have to find in order to grant the variance . . . . Having an expert merely repeat the statutory standard for a c-2 bulk variance, and opine that the application would meet it, is an insufficient showing on which a court should base a finding of reasonable probability of the grant of a c-2 bulk variance, under *Caoili*, to allow the jury to hear that testimony and consider the change in zoning when determining just compensation. An expert must "give the why and wherefore that supports the opinion, rather than a mere conclusion."

*Id.* at 1178 (quoting *Pomerantz Paper Corp. v. New Cmty. Corp.*, 25 A.3d 221, 237 (N.J. 2011)). The Court justified this high bar because testimony that a variance would be granted "has a strong capacity to influence the jury's valuation decision. The valuation of property taken by eminent domain must be based on sound evidence. The public's money is at stake. A property holder is entitled to just compensation, not a windfall." *Id.* at 1178. With that framing in mind, the Court turns to Ritter's proposal.

### i.    *Ritter's Proposal for Parcel Two*

Beginning with Parcel 2, the Court finds that SB Building has failed to establish that it is reasonably probable that a parking variance would be granted to build Ritter's proposed 200,000 square foot warehouse. Ritter acknowledges that his proposed 200,000 square foot warehouse would require space for 600 cars under the zoning ordinances rather than the 183 spaces Ritter provides. (Ritter Report at 5.) In a de facto conclusory manner, Ritter surmises that the board

would likely grant a parking variance essentially because the board would recognize that the ordinance's parking requirements are outdated and unnecessary. (*Id.* at 5–6; Hr'g Tr. at 241:19–244:11.)

The primary flaw in Ritter's opinion is his failure to address the positive and negative criteria that *Saddle River* instructs must be considered in granting any variance. To receive a parking variance, a property owner must demonstrate compliance with one of the two provisions of N.J. Stat. Ann. § 40:55D-70(c)—also called a C variance. *See Jacoby v. Zoning Bd. of Adjustment of Borough of Englewood Cliffs*, 124 A.3d 694, 706 (N.J. Super. Ct. App. Div. 2015) (considering whether a C variance applied to an applicant seeking a bulk variance for the number of parking spaces). The applicant can either establish "hardship related to the physical characteristics of the land or the existing structure" under section (c)(1) or that a variance would "advance[] the purposes of [New Jersey's Municipal Land Use Law ('MLUL') [where] the benefits of the deviation outweigh any detriment" under section (c)(2). *Id.* at 707 (citation omitted). "To establish a [C-2] variance, the applicant must show that the purposes of the MLUL would be advanced, the variance can be granted without substantial detriment to the public good, the benefits of the variance will outweigh any detriment, and that the variance will not substantially impair the intent and purpose of the zoning plan and ordinance." *Id.* at 707 (citing *Wilson v. Brick Twp. Zoning Bd. of Adjustment*, 963 A.2d 1208, 1213–14 (N.J. Super. Ct. App. Div. 2009)). Showing the negative criteria requires considering the variance's effect on the surrounding properties, such that the "harms, if any, are substantially outweighed by the benefits." *Id.* at 708 (citation omitted). A C-2 variance will only be granted if it "actually benefit[s] the community" because it is "a better zoning alternative for the property"; conversely, it will not be granted when "merely the purposes

of the applicant will be advanced." *Id.* at 707 (citing *Kaufmann v. Plan. Bd. for Warren Twp.*, 542 A.2d 457, 463 (N.J. 1988)).

*Saddle River*'s outcome was driven by the expert's failure to consider these positive and negative criteria. There, the New Jersey Supreme Court considered whether the condemnee's planner, Hals, had established a reasonable probability that a C-2 bulk variance would be granted for a bank covering 42 percent of a lot, which would have exceeded the 30 percent limit set by ordinance. 77 A.3d at 1164–65. At a pre-trial hearing, Hals opined that the variance would be granted because none of the existing commercial development in the borough complied with the 30 percent requirement. *Id.* at 1168. As the Court summarized, at trial Hals testified:

> that the variance would be granted by the Board because the application would advance the purposes of the MLUL: the application would be consistent with other commercial property layouts in town; the layout is aesthetically pleasing; the landscaping would promote adequate light, air, and open space; there is no overbuilding of the property by using 42 percent improved lot coverage; and the site plan is sensitive to the surrounding residential areas. Beyond that, Hals did not further address how the granting of the bulk variance for this specific property would provide a positive benefit to the community from a zoning perspective. Nor did he specifically address how the variance could be granted without impairing the intent and purpose of the zone plan and ordinance (the negative criteria), which is what the Board would have been required to conclude in order to grant the variance.

*Id.* The Court held that Hals's analysis "inadequately addressed all the considerations that a Board must consider before it may grant a [C-2] bulk variance, specifically the "positive and negative criteria" required by the MLUL. *Id.* at 1178 (citing N.J. Stat. Ann. § 40:55D-70(c)(2) and *TSI E. Brunswick, LLC v. Zoning Bd. of Adjustment of E. Brunswick*, 71 A.3d 762 (N.J. 2013)).[23] The

---

[23] Specifically, the Court noted that Hals offered no evidence as to how the bulk variance would "actually benefit the community in that it represents a better zoning alternative for the property"; could "be granted without substantial detriment to the public good"; or would "not substantially impair the intent and the purpose of the zone plan and zoning ordinance." *Saddle River*, 77 A.3d at 1178 (citations and quotations omitted).

"zoning actions taken in other towns" on which Hals relied were "ordinarily [] not relevant to a particular municipality's zone plan." *Id.* at 1168. In sum, the Court concluded that Hals did not "explain[] the 'why or wherefore' as to whether the benefits to the community 'substantially outweigh[ed] any detriment' to the zoning plan . . . ." *Id.* at 1178 (quoting *Pomerantz Paper Corp.*, 25 A.3d at 237).

A straightforward application of *Saddle River* leads to the same result here. Ritter's six-page report and its several pages of exhibits make no mention of N.J. Stat. Ann. § 40:55D-70(c), a C-2 variance, or the positive and negative criteria that an applicant must address to receive the parking variance. (*See generally* Ritter Report.) In order to weigh "the purposes of the MLUL" and whether the variance will "substantially impair the intent and purpose of the zoning plan and ordinance," *Jacoby*, 124 A.3d at 707, Ritter would need to first articulate the purposes of the MLUL and the zoning plan. Further, a C-2 variance requires showing that the variance "actually benefit[s] the community in that it represents a better zoning alternative for the property." *Saddle River*, 77 A.3d at 1178 (citation omitted). Ritter's report is likewise silent on this point. Without "address[ing] all the considerations that a Board must consider before it may grant a [C-2] bulk variance," *id.* at 1178, Ritter's proposal for Parcel 2 fails to meet *Saddle River*'s bar.[24]

Ritter's brief discussion of the C-2 variance at the hearing does not make up for his report's deficits. When prompted, Ritter described the requirements for a C-2 variance and simply concluded that the variance "will not really affect or have a negative impact on the township zone ordinance or zone plan." (Hr'g Tr. at 259:8–260:10.) However, "[h]aving an expert merely repeat

---

[24] Citing *Saddle River*, the Agency's brief repeatedly complains that Ritter's report fails to address the positive and negative criteria required for variance relief. (ECF No. 190-1 at 19–20, 23 n.3, 27.) The Agency's attorney reiterated this point at the hearing. (*See* Hr'g Tr. at 697:14–18.) Despite this focus of the Agency's criticism, SB Building's brief does not mention *Saddle River*, N.J. Stat. Ann. § 40:55D-70(c), or the positive and negative criteria that must be considered in granting a parking variance.

the statutory standard for a [C-2] bulk variance, and opine that the application would meet it, is an insufficient showing" under *Caoili. Saddle River*, 77 A.3d at 1178. Explaining why the variance would have no negative impact, Ritter testified:

> [T]he district, the manufacturing district here in town, this is the only manufacturing district in town. So essentially, any decision made here on this property will quiet any other issues in terms of the zoning district, because there is only one use being proposed -- well, two: commercial in the front and warehouse in the back -- so it won't apply to a bigger area.

(Hr'g Tr. at 260:18–24.) The Court cannot parse this statement to understand how the parking variance intersects with the residential nature of the neighborhood abutting the Property.

Ritter also reiterated the rationale from his report that the zoning ordinance's parking requirements were outdated and inconsistent with national standards and what other boroughs Ritter is familiar with would require. (*Id.* at 260:25–261:11.) However, assuming *arguendo* Ritter's position that the B-2 zoning parking requirements are "inconsistent with current standards for parking for warehousing uses," not required by other municipalities, and not required by studies from the ITE, (Ritter Report at 5), approvals granted under a different ordinance do not meet the *Saddle River* standard. *See Saddle River*, 77 A.3d at 1168 (criticizing expert's reliance on "earlier [variance] approvals granted when the Borough had more lax standards in place"). Thus, Ritter fails to substantiate his belief that a parking variance would confer any "benefit [to] the community," "substantial detriment to the public good," or "the intent and the purpose of the zone plan and zoning ordinance." *Id.* at 1178 (citations and quotations omitted). Likewise, Ritter's reliance on variance grants made in Lopatcong Township, (Ritter Report at 5–6), does not meet his burden. *See Saddle River*, 77 A.3d at 1168 (criticizing expert's reliance on variance "actions taken in other towns . . . that [are] ordinarily not relevant to the instant town's zone plan"); *see*

*also Kohl v. Mayor & Council of Borough of Fair Lawn*, 234 A.2d 385, 389 (N.J. 1967) (holding that a variance application "must turn on its own circumstances").

On the final page of his report, Ritter lists reasons for granting a variance that echoes the positive and negative criteria required in *Saddle River*. Ritter writes that the parking variance would "increas[e] the building setback" from the residential area, "preserv[e] [additional] area for surface parking, additional landscaping, and greenery," and "creat[e] a more desirable visual environment more consistent with the downtown environment and adjoining residential neighborhood." (Ritter Report at 6.) However, as noted above, a restatement of the C-2 variance's requirements without applying the requirements to the specific property is insufficient. *See Medici v. BPR Co.*, 526 A.2d 109, 121 (N.J. 1987) ("[A] conclusory resolution that merely recites the statutory language will be vulnerable to the contention that the negative criteria have not been adequately established.").

Indeed, considered in the context of Ritter's specific proposal for Parcel 2, Ritter's assertion that a parking variance would benefit the community is perplexing. While Ritter writes that the parking variance would "preserv[e] area for surface parking, additional landscaping, and greenery," (Ritter Report at 6), his proposal is not to reduce the amount of required parking in order to create more open space at the property. If it were, it would offer support as to how a variance would "lessen[] the visual impact of the proposed" warehouse on the neighboring residences "by increasing the [warehouse] setback" from the residential area and "reduc[e] the encroachment of permitted industrial uses on adjoining residential uses." (*Id.*) However, a review of the site layout Ritter proposes, (Ex. B to Ritter Report), makes clear that there is no additional open space for greenery or a buffer zone that would be opened up by a parking variance.[25]

---

[25] A simple example illustrates this point. Suppose a developer wished to build a 5-acre warehouse on a 10-acre parcel; the zoning ordinances required a 5-acre parking lot for a warehouse of that size; and the

In truth, the only reason Ritter's proposal would require a parking variance is because he crafted his proposal for Parcel 2 to maximize the size of the warehouse. (Hr'g Tr. at 239:4–10.) Essentially, Ritter's recitation of general considerations that could support a parking variance makes little sense in the context of what Ritter is actually proposing: to build a significantly larger warehouse than the lot could normally accommodate by reducing the amount of space needed for parking. However, "no [C-2] variance should be granted when merely the purposes of the owner will be advanced. The grant of approval must actually benefit the community in that it represents a better zoning alternative for the property." *Kaufmann*, 542 A.2d at 463. Ritter's report and testimony failed any semblance of such a showing.

Ritter's discussion of a multi-level parking structure to ameliorate the parking deficiency does not change this conclusion. While the Agency sought to bar this testimony based on an assumption that Ritter proposed building a parking structure with enough levels that no parking variance would be required, (ECF No. 190-1 at 22–24), Ritter testified the parking structure would not violate the height restriction because levels would only be built to reduce the extent of the parking nonconformity, not entirely bring it into conformance, (Hr'g Tr. at 245:21–24). The Agency's confusion is understandable, as Ritter's report's sole discussion of the parking structure is a one-sentence reference to the drawing depicting the proposal. (*See* Ritter Report at 6.) However, for the reasons articulated above, the fact that a parking structure could reduce the

---

developer sought a parking variance to instead build her warehouse with only a 2-acre parking lot. In that case, she could credibly argue to the board that granting a parking variance would free up 3 acres of space on the lot to increase the building setback from the residential area, preserve additional area for greenery, and create a desirable visual environment more consistent with the adjoining residential neighborhood.

However, if instead the developer's purpose in seeking a variance is to permit her to build an 8-acre warehouse with only a 2-acre parking lot, it is difficult to see how any of these benefits would be achieved by the variance. Granting a parking variance would not open up space for the community's benefit but rather enable the developer to build an extra 3 acres of warehouse space.

variance needed does not remediate the issue explained above that Ritter has failed to establish a reasonable probability that a C-2 variance would be granted.[26]

ii.     *Ritter's Proposal for Parcel Three*

Turning to Parcel 3, the Court will bar Ritter's proposal for Parcel 3 because it relies on an untenable assumption, namely that the parking deficiency on Parcel 3 is a preexisting nonconforming condition. The Agency's primary challenge to Ritter's Parcel 3 proposal is that it

---

[26] The Agency seeks to bar the entirety of Ritter's report and testimony. (ECF No. 190-1 at 35.) As is plain from Ritter's six-page report, Ritter's sole proposal for the Property is to build 200,000 square feet of warehouse space on Parcel 2. (*See generally* Ritter Report.) Ritter conceded same at the hearing. (Hr'g Tr. at 265:2–5; *see also id.* at 280:15–17.) In a line of questioning at the hearing, SB Building's counsel asked Ritter the warehouse volume that could be built on Parcel 2 if no variance were granted, to which the Agency's counsel repeatedly objected on the grounds that any alternative proposal was outside the scope of Ritter's report (*Id.* at 249:19–259:6.)

A party is required to disclose an expert's written report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them," Fed. R. Civ. P. 26(a)(2)(B)(i), and to supplement the report regarding both "information included in the report and to information given during the expert's deposition." R. 26(e)(2). If a party fails to disclose or supplement an expert report as required by Rule 26, it is "not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, Ritter has not disclosed any opinion regarding an alternative use for Parcel 2 beyond the one requiring a variance. Nor has Ritter filed a supplemental report including a new opinion proposing an alternative use, despite the Court's reminder at the hearing that an expert will be restricted at trial "to the four corners of his report." (Hr'g Tr. at 250:12–251:5.) While Barree's 2019 report mentioned the size of a warehouse that could be built at the Property without seeking a variance, (Barree 2019 Report at 26), and Ritter acknowledged reviewing same, (Hr'g Tr. at 251:21–252:5), Ritter's 2022 report is silent on this point and Ritter at no point submitted a supplemental report or sought leave to do so. Instead, SB Building inexplicably put all its hopes in Ritter's unsupported 200,000 square foot warehouse proposal. This litigation strategy is perplexing in light of the fact that SB Building and Berger are sophisticated, well-financed parties who are highly experienced litigants as noted previously.

Ritter's decision to omit a proposal for Parcel 2 in his report that would not require a parking variance or propose an alternative is confounding for the additional reason, as even if the Court found that his nonconforming proposal had a reasonable probability of being granted, *Saddle River* makes clear that the jury would need to hear *both* the conforming and nonconforming proposals in order to assess fair value. As the Court explained there, "the jury's actual determination of a just compensation award takes into account a *premium* based on the reasonable probability of a zoning change." 77 A.3d at 1176 (emphasis added) (citation omitted). To do this, the jury "first must value the property in its current condition, considering the zoning at the time of the taking, which establishes the base value." *Id.* at 1176 (citation omitted). Only then can the jury "consider the probability of the future zoning change or variance approval in determining the premium a buyer and seller would fix to the property" by adding the premium to the base value. *Id.* Applying this settled procedure, it is unclear how the jury would have been able to properly value Ritter's proposed Parcel 2 without his report setting forth what could be built without a variance.

lacks sufficient parking. (ECF No. 190-1 at 24–25.)[27] The Ritter Report's sole mention of the

parking on Parcel 3 is that it is a "Preexisting nonconforming condition." (Ritter Report at 5.)

Ritter also writes that the "proposed subdivision has been configured to not make any building or

the proposed lot more nonconforming in any manner than they may presently be." (*Id.* at 4.) At

the hearing, Ritter explained that this statement in his report referred to Milltown's zoning

ordinances that provide "a grandfather clause that deals with future subdivision." (*Id.* at 227:20–

228:7.) The relevant ordinance states:

> The lawful use of land, buildings or structures existing (as of February 19, 1950) when this chapter was adopted, may be continued on the lot or in the structure although they may not conform to this chapter, and any such structure may be restored or repaired in the event of partial destruction thereof; provided, however, that none shall be enlarged, extended, relocated, converted to another use or altered, except in conformity with this chapter and as permitted below. Land on which a nonconforming use or structure is located, and any nonconforming lot, shall not be subdivided or resubdivided *so as to be made more nonconforming in any manner*.

(Milltown Code § 34-33.16 (emphasis added).)

SB Building is undoubtedly correct that if the entire Property continued to be used in the

manner it is today, the parking deficiency on Parcel 3 would constitute a preexisting

nonconforming condition. (*See* ECF No. 196 at 9–10.) If an ordinance is enacted that requires a

certain amount of parking and prior to its passage a property had a deficient amount of parking,

"the continued utilization of the property" with insufficient parking would be "legally protected as

a nonconforming use." *Dresner v. Carrara*, 353 A.2d 505, 506 (N.J. 1976); *see also Reich v.*

---

[27] The Agency further criticizes Ritter's proposal because he does not address the variance needed for the dance studio currently renting a portion of a building on Parcel 3 to continue operating there. (ECF No. 190-1 at 18–19.) SB Building responds that Ritter's proposal does not depend on the dance studio remaining a tenant and that its continued tenancy is irrelevant for the feasibility of Ritter's plan. (ECF No. 196 at 7–8.) The Court agrees with SB Building that nothing in Ritter's report suggests that the dance studio's operation on Parcel 3 is required for his hypothetical development.

*Borough of Fort Lee Zoning Bd. of Adjustment*, 999 A.2d 507, 519 (N.J. Super. Ct. App. Div. 2010). As Ritter testified, "over the years, though, [the buildings on Parcel 3] have operated with that parking, and that it's continued to function" and that therefore the current parking deficiency is "basically grandfathered." (Hr'g Tr. at 227:2–8.) Although not clearly stated, the Court discerns that the Agency does not contest this basic premise.

The dispute arises over the last sentence of the grandfather provision, which prohibits a nonconforming property from being "subdivided or resubdivided so as to be made more nonconforming in any manner." (Milltown Code § 34-33.16.) The proposal contained in Ritter's report repeatedly describes a proposed subdivision. (Ritter Report at 3 ("The remaining industrially zoned portion of the property would be divided so that 8.45 acres would be subdivided off as a matter of right to accommodate approximately 170,000 square feet of occupied industrial buildings."); *id.* at 4 ("The proposed subdivision has been configured to not make any building or the proposed lot more nonconforming in any manner than they may presently be."); *id.* at 5 ("Onsite parking will not be reduced because of the proposed subdivision.").) Likewise at his deposition, Ritter agreed that "a subdivision is required here in order to complete" Ritter's proposed development. (Dep. Tr. of George Ritter ("Ritter Dep.") at 39:22–40:2, Ex. B to Apr. 15, 2024 Cert. of Anthony DellaPelle, ECF No. 196-1.) References to Parcel 1, Parcel 2, and Parcel 3 in Ritter's report make unmistakably clear that his proposal and resulting opinions require subdivision. (*See generally* Ritter Report.)

Nonetheless, at the hearing, Ritter appeared to pivot and walk back this position, testifying that his report discussed subdivision as a matter of "convenience" to "better . . . define the property," but that "[t]here is no reason that [it] has to be subdivided." (Hr'g Tr. at 200:9–16; *see also id.* at 220:16–221:5 ("[U]nder the Township code, there is absolutely no reason that it has to

be subdivided. It could be all one large manufacturing lot."); *see also id.* at 222:19–223:4.)

However, on cross examination, the following exchanged occurred:

> Q. Well, you haven't done any of the positive/negative criteria with respect to a parking variance on Parcel 3, which is the already-existing building. You would have to do that if there was no subdivision line, correct? Because there would be, even under your interpretation, no grandfathering?
>
> A. It would be part of the same presentation to the board for the variance, the criteria.
>
> Q. Okay. So you would need a variance with respect to the entire parcel and not just for what you have told us you need for the new 200,000-square-foot building?
>
> A. If they were merged, *I think you would be asking for a variance based on the entire tract.*

(Hr'g Tr. at 266:8–19 (emphasis added).) In other words, Ritter conceded that if the Property were not subdivided into the three parcels he proposes, an applicant seeking a variance would have to do so "based on the entire tract." (*Id.*) Ritter did not analyze such a variance here, having only formed an opinion as to whether developing each of the three newly-created parcels individually was viable. In light of this admission, it is clear that subdivision would be required to effectuate Ritter's proposal, as Ritter only separately considered whether Parcel 2 and Parcel 3 could be developed as he proposed.

Turning back to Milltown's grandfather clause, the Court agrees with the Agency that subdividing the Property as Ritter contemplates would make the parking deficiency "more nonconforming." (Milltown Code § 34-33.16.) The Agency relies on the New Jersey Superior Court, Appellate Division's reasoning in *Razberry's, Inc. v. Kingwood Twp. Plan. Bd.*, 593 A.2d 1264 (N.J. Super. Ct. App. Div. 1991). (ECF No. 190-1 at 26.)[28] *Razberry's* involved an eight-acre

---

[28] While Ritter's plan clearly encompasses subdividing the Property into multiple parcels in order to seek variance relief for one and grandfathered status for another, SB Building does not discuss *Razberry's* in its opposition because it takes the position that subdivision is not required, and therefore Milltown Code § 34-33.16 is not implicated. (*See generally* ECF No. 196 at 9–10.)

property located within a commercial district that contained a residence that was a valid nonconforming use. 593 A.2d at 1265. The applicant to the board proposed to divide the property into two new lots, one of which would be used for commercial development and one of which would continue to be used as a residence. *Id.* Interpreting N.J .Stat. Ann. § 40:55D-68 ("Any nonconforming use . . . existing at the time of the passage of an ordinance may be continued upon the lot . . . so occupied . . . ."), the court held that "when a lot occupied by a nonconforming use is subdivided, a prerequisite of the lawful continuation of the use, its operation upon the same lot, no longer can be satisfied." *Razberry's, Inc.*, 593 A.2d at 1265. Applied to the applicant's subdivision request, the court held:

> [A] reduction in the size of the property occupied by a nonconforming use, with a resulting decrease in the buffers between conforming and nonconforming uses, is just as likely to increase the conflict between a nonconforming use and surrounding conforming uses as an expansion of the facility containing the nonconforming use or an intensification of that use. Therefore, a reduction in the size of the property occupied by a nonconforming use may result in a substantial increase in the nonconformity.

*Id.* at 1266. The court set aside the planning board's approval of the application for subdivision approval on that basis. *Id.* The Agency contends that, similarly here, "the proposed subdivision would result in a smaller lot available for the existing buildings thereby greatly increasing the existing nonconformity with respect to parking." (ECF No. 190-1 at 26.)

The Court agrees that under *Razberry's* holding and the language of Milltown Code § 34-33.16, subdividing the Property in order to carry out Ritter's proposal would result in an increase in the nonconformity. Prior to subdivision, the parking nonconformity for the 170,000 square feet of warehouse buildings will be spread out across the 22.4 acres of the Property. Critically, Ritter agreed that the vehicles parked across the Property—both those on Parcel 2 and Parcel 3—may well have belonged to tenants of the buildings on Parcel 3:

> Q. Well, there is no restriction, no limitation. The existing buildings can utilize the entire site for parking, isn't that true?
>
> A. Yes, for any kind of parking.

(*See* Hr'g Tr. at 267:23–268:1.) Because there is no basis to conclude that the parking for Parcel 3's buildings has always stayed within the bounds of Parcel 3, the parking nonconformity is applied to the entirety of the Property. Therefore, the "reduction in the size of the property occupied by a nonconforming use"—from 22.4 acres of parking for 170,000 square to 8.45 acres for the same buildings—"may result in a substantial increase in the nonconformity." *Razberry's, Inc.*, 593 A.2d at 1266. Finally, while Ritter testified that subdividing the lot to create a separate Parcel 3 would not make the parking condition more nonconforming, (Hr'g Tr. at 271:5–6), he conceded at his deposition that this belief was based on his "assumption" as to what the board would do, rather than an opinion grounded in the law, (Ritter Dep. at 45:19–46:9).[29]

### iii. Otteau's Opinions Derived from Ritter's Report

The Agency challenges Otteau's report to the extent that Otteau relies on Ritter's opinions that the Court finds inadmissible. (ECF No. 190-1 at 30–34; *see also* Hr'g Tr. at 687:7–10.) The Agency argues that Otteau's appraisal of the Property depends on the legal viability of Ritter's proposed development. (ECF No. 190-1 at 30–31.) As their argument goes, because Ritter did not demonstrate that it was reasonably likely that his sole proposal for Parcel 2 and Parcel 3 would receive board approval, Otteau's opinion that relies on Ritter's proposal is inadmissible. (*Id.* at 34.) In opposition, SB Building does not argue that Otteau formed his opinions without relying on

---

[29] The Agency also argues that Ritter's opinion should be barred because his proposed use for the Property runs counter to the Borough's affordable housing obligations. (ECF No. 190-1 at 27–29.) For the reasons set forth in the section below addressing SB Building's motion to bar the Agency's experts from testifying that development to achieve the Borough's affordable housing obligations are the only legally permissible use of the Property. *See* Section III.B.1, *infra*.

Ritter's report. (*See generally* ECF No. 196.) Instead, SB Building defends Ritter's opinions and concludes that because Ritter's opinions are admissible, Otteau's are as well. (*Id.*)

SB Building's counsel agreed at the hearing that SB Building does not challenge the fact that Otteau relied on Ritter's planning expertise for his opinion. (Hr'g Tr. at 717:20–24 ("[Otteau] relied on Mr. Ritter for two things: Number one, how many square feet could you build? And secondly, is it probable that a variance might be granted, because that's something that a buyer and seller might care about?").) Indeed, Otteau explicitly acknowledged that he relied on Ritter for the "extraordinary assumption" regarding how the Property could be legally developed because he was unqualified to form opinions on the subject of Ritter's report. (Otteau Report at 16; Hr'g Tr. at 388:9–16.) Therefore, Otteau's opinion will be stricken to the extent it relies on the assumption that Ritter's proposals for the Property are feasible. *See Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014) (striking expert's valuation opinion where it relied on another witness's "unsupported, subjective analysis").

\* \* \*

In summary, the Agency's Motion *in Limine* regarding Ritter, (ECF No. 190), is granted in part and denied in part. Ritter's opinions and testimony to develop a 200,000 square foot warehouse on Parcel 2 are barred in their entirety. To the extent Ritter seeks to preserve the existing warehouse use on Parcel 3 by subdividing the Property and arguing that the parking deficiency on Parcel 3 is a preexisting nonconforming use, such testimony is likewise barred. While the Agency moves to strike the entirety of Ritter's report and bar his testimony, the Agency's brief is silent with respect to his Ritter's proposal to develop Parcel 1 for commercial uses, and the Court finds no basis to strike his Parcel 1 proposal. Finally, to the extent Otteau relies on these stricken portions of Ritter's report, his opinions are likewise barred.

### 2.      Testimony from Ronald Petillo

The Agency moves to exclude Petillo's opinion that debris from the previously demolished buildings on Parcel 2 could be crushed and re-used as on-site fill, as well as any portion of Otteau's opinion that relies on Petillo. (ECF No. 189-1.) The Agency argues that Petillo's cost calculations for work at the Property are based on the unfounded, unsupportable assumption that there is no asbestos contamination in the debris that would prevent the debris from being recycled for use at the site. (*Id.* at 6–7.) The Agency contends that Petillo is unqualified to determine whether the debris is contaminated by asbestos. (*Id.*) In addition, the Agency argues that the documentation Petillo relied on about asbestos at the Property itself contained no substantive analysis that could permit Petillo to rely on it. (*Id.* at 8–10.) Finally, the Agency preemptively argues that Federal Rule of Evidence 703, which permits an expert to rely on another expert's facts and data under certain circumstances, is inapplicable here. (*Id.* at 10–11.)[30]

SB Building agrees that Petillo is not an expert in asbestos remediation but argues that he was permitted to assume that there is no asbestos remaining in the demolished buildings. (ECF No. 195 at 2.) SB Building argues that the Agency's belief that there *may* be asbestos in the debris does not render Petillo's opinion speculative. (*Id.*) SB Building cites portions of the record supporting their belief that when the buildings were demolished before, there was no asbestos present or any remaining asbestos was remediated. (*Id.* at 2–3.) SB Building cites to a number of sources which Petillo relies on to conclude there is no asbestos, (*id.* at 4–6, 10–11), which SB

---

[30] The Agency's Motion *in Limine* broadly seeks exclusion of Petillo's "report and testimony . . . in their entirety." (ECF No. 189-1 at 13; *see also* ECF No. 189-5.) However, the only criticism the Agency makes against Petillo's report in its brief is its assumptions regarding the presence of asbestos in the demolition debris. Therefore, the Court considers only the admissibility of that portion of his testimony.

Building contends is the type of information experts typically rely on under Rule 703, (*id.* at 11–12).[31]

The Agency first challenges Petillo's qualifications to form an opinion as to whether there is asbestos in the demolition debris at the Property. Petillo agreed that he and his company were not licensed or qualified to conduct asbestos testing or otherwise determine whether asbestos was present at a jobsite. (Hr'g Tr. at 568:19–569:20, 622:7–16.) To determine whether asbestos is present at a jobsite—and therefore whether Petillo may proceed with demolition—Petillo relies on a licensed company to survey the site and, if asbestos is present, to remediate the contamination. (*Id.* at 571:16–24.) In light of this undisputed testimony from Petillo, it is clear that Petillo lacks "specialized expertise" under Rule 702, *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 655 (D.N.J. 2008), that would permit him to test the debris and buildings at the jobsite and render an opinion as to whether asbestos was present.

The Court thus turns to whether Petillo offered sufficient basis for his assumption that there is no asbestos remaining in the tons of debris on the Property that would prevent it from being recycled as RCA in future construction. An expert may form an opinion based on "facts or data in the case that the expert has been made aware of or personally observed," even if those facts are inadmissible, so long as "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." Fed. R. Evid. 703. "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) (citing Fed. R. Evid. 703). Experts commonly testify in reliance on data provided by others. *See Kannankeril v.*

---

[31] SB Building also makes several arguments related to those raised in their Motion *in Limine* that New Jersey law requires any consideration of the remediation costs to be deferred to a subsequent suit. (ECF No. 195 at 7–8.) These arguments are addressed below, *see* Section II.B.3, *infra*.

*Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir. 1997), as amended (Dec. 12, 1997) (holding that doctor's expert opinion was admissible though he only examined patient's medical records and did not personally conduct a physical examination).

However, there are limits to the facts and data that an expert may rely on. The Supreme Court's decision in *Daubert* that established the court as the gatekeeper of expert testimony extends to Rule 703. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3d Cir. 1994). In determining whether an expert relied on data "reasonably" relied on by other experts in the field, the court "must conduct an independent evaluation into reasonableness." *Id.* The Third Circuit continued:

> The judge can of course take into account the particular expert's opinion that experts reasonably rely on that type of data, as well as the opinions of other experts as to its reliability, but the judge can also take into account other factors he or she deems relevant.

*Id.* Similar to the reliability requirement under Federal Rule of Evidence 702, "there must be good grounds on which to find the data reliable." *Id.* Put differently, "[i]f the data underlying the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (affirming exclusion of expert testimony based solely on health "summaries [] made by employees of Trial Plaintiffs' counsel").

SB Building points to a number of supposed bases Petillo had to support his assumption that the debris at the Property was not contaminated. (ECF No. 195 at 10–11.) Petillo acknowledges that before he demolished the buildings in 2016 and 2017, there was asbestos present in five of the buildings slated for demolition. (Ex. E to Petillo Report; Hr'g Tr. at 590:23–591:11.) Therefore, the Court looks to whether the facts Petillo relies on are the "type of data *reasonably* relied upon by experts." *In re Paoli*, 35 F.3d at 748 (emphasis in original). Reviewing

the data Petillo cites, the Court finds that Petillo has not offered "good grounds" to find that the data is reliable or that Petillo's reliance on it is reasonable. *Id.*

First, SB Building cites Petillo's claim that he reviewed prior reports from Najarian supporting his assumption that the demolition debris could be reused at the site. (ECF No. 195 at 10.) However, Petillo's report only referenced work product from Najarian in one sentence in passing. (Petillo Report at 6.) At his deposition, Petillo was unable to point to which specific portion of Najarian's report supported this conclusion. (Dep. Tr. of Ronald Petillo at 15:7–19, Ex. L to O'Connor Decl., ECF No. 189-4.) At the hearing, Petillo did not mention any report from Najarian that would support his assumption regarding asbestos at the Property. (*See generally* Hr'g Tr.) Given his inability to point to any specific portion of any report from Najarian that supports his position—as well as Najarian's own opinions that the Petillo's conclusions are wrong, *see* Section I.D.3, *infra*—Petillo's reliance on Najarian is unreasonable.

Next, SB Building argues that the process that resulted in Petillo receiving a permit to carry out demolition at the Property supports his assumption that the construction debris at the Property is asbestos-free. (ECF No. 195 at 11.) Petillo writes that before he began demolition, Rasmussen remediated the asbestos in the entirety of the buildings, and Tiger Environmental submitted a report to the municipality certifying that there was no remaining asbestos in the buildings to be demolished. (Petillo Report at 5 ("Further, as part of the process of obtaining a demolition permit for the 2016-2017 Demolition from the Borough of Milltown, a report from Tiger Environmental was submitted to the municipality certifying that there was no remaining regulated asbestos at the buildings which were to be demolished."); *see also* Hr'g Tr. at 594:9–19 ("You have to have an 'all clear' from the environmental person that did the survey.").)

However, Petillo's reliance on these facts to assert that the buildings he subsequently demolished were fully remediated is belied by Petillo's own testimony. At the hearing, Petillo testified that the licensed contractor only remediated the portions of the buildings containing asbestos *other than* the roofs. (Hr'g Tr. at 592:16–593:10.) After a demolition permit was issued, Petillo himself demolished fifteen buildings, including five that had ACMs in the roof. (*Id.* at 595:22–596:21.) Rasmussen remediating part of the buildings, Tiger Environmental certifying that there was no remaining regulated asbestos at the buildings, and Petillo receiving a demolition permit all *preceded* Petillo demolishing buildings that contained asbestos. Therefore, no "good grounds" exist for Petillo to rely on these incomplete remediation steps to assume that the buildings to be demolished were asbestos-free at the time Petillo demolished them.[32]

Although Petillo's report does not mention that he remediated any asbestos-containing materials during his demolition activities, at the hearing he testified that he that he disposed of the asbestos-containing C&D material at a certified landfill. (Hr'g Tr. at 598:23–599:17, 651:5–10.) However, New Jersey law sets out specific procedures that must be followed in carrying out asbestos remediation. The law requires securing a permit for any "asbestos hazard abatement project" and specifies that "[a]ll work shall be monitored and controlled by the asbestos safety control monitor who will advise the enforcing agency of its findings." N.J. Admin. Code § 5:23-

---

[32] Likewise problematic is Petillo's failure to disclose Tiger Environmental's testing in 2016 that produced the "all clear" signal after Rasmussen carried out the remediation or the demolition permit purportedly issued before Petillo could begin work. Federal Rule of Civil Procedure 26 requires a party to disclose "the facts or data considered by the witness in forming" an expert opinion. Fed. R. Civ. P. 26(a)(2)(B)(ii). Because Petillo has not done that here, the Court is left with nothing beyond Petillo's bare claim that supposedly a municipal code official issued a permit for the demolition.

Further, Petillo cannot rely on his presence at the jobsite during Rasmussen's remediation to opine that the remediation was successful because Petillo agrees that he was not involved in Rasmussen's remediation work at the site, (Hr'g Tr. at 586:12–24), Petillo only briefly visited the Property while the work was going on, (*id.* at 593:11–14), and Petillo was not qualified to perform remediation work, (*id.* at 568:19–569:20, 586:12–24, 622:7–14).

8.5(a); *see also id.* § 5:23-8.18 (requiring this provision to be followed for demolition projects). The code requires that an "asbestos safety technician" be "continuously [] present to observe the progress off work and perform required inspections and tests" during the work. *Id.* § 5:23-8.7(b)(1).[33] Included in the safety technician's responsibilities are ordering corrective action if she observes "negligence and/or flagrant disregard for the safety off any person, including the possibility of contaminating the building environment," *Id.* § 5:23-8.10(d)(2), as well as "monitoring the removal of all asbestos-contaminated waste from the work area to ensure that it takes place in conformance with" N.J. Admin. Code. § 5:23-8.22. *Id.* § 5:23-8.22(d)(7).

Here, Petillo offer no evidence that when he demolished the asbestos-containing buildings on Parcel 2, he did so in compliance with New Jersey law. First, no asbestos safety technician was present when Petillo demolished the asbestos-containing buildings to monitor the "possibility of contaminating the building environment." *Id.* § 5:23-8.10(d)(2). Likewise, no technician was present to monitor the removal of the ACM waste "to ensure that it takes place in conformance with" the NJDEP rules. *Id.* § 5:23-8.22(d)(7). Petillo himself was not qualified to perform this role, as he admittedly is not licensed to perform remediation work by the state. (Hr'g Tr. at 568:19–569:20, 586:12–24, 622:7–14.) While Tiger Environmental and Rasmussen may have been statutorily qualified to perform remediation work, the only evidence is that they were involved during the remediation in the first portion of the demolition project before Petillo demolished the unsafe buildings. Therefore, the Court finds that Petillo lacks "specialized expertise," *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 655 (D.N.J. 2008), in order to opine that he

---

[33] An "asbestos safety technician" is "a person certified by the New Jersey Department of Community Affairs, hired by the asbestos safety control monitor who continuously monitors and inspects the asbestos abatement work pursuant to this subchapter. This person shall be required to be on the job site during the time the asbestos abatement work is taking place and perform all duties and responsibilities established by these regulations." N.J. Admin. Code § 5:23-8.2; *see also id.* § 5:23-8.10(d) (delineating the jobsite responsibilities of an asbestos safety technician).

demolished the buildings in a way that ensured no asbestos remained in the resulting debris. While the Court does not consider a proposed expert's credibility in assessing the reliability of his methods under Rule 702, *Elcock v. Kmart Corp.*, 233 F.3d 734, 751 (3d Cir. 2000), the Court is bound under 702 to exclude unreliable testimony. Petillo's opinion on this topic is such testimony.

Najarian's report provides further support for the Court's conclusion that the facts and data Petillo relied on are not of the type an expert reasonably relies on. *See In re Paoli*, 35 F.3d at 748 (noting that the court can "take into account . . . the opinions of other experts" as to the reliability of facts and data"). Najarian explained that Petillo's proposal to crush and recycle the debris onsite ignores the NJDEP's requirements for sampling and testing for asbestos or PCBs before reusing building materials at a site. (Najarian Dec. 2021 Report at 7.) Najarian noted that Petillo's acknowledgement that he demolished buildings with asbestos still in the roofing material means that "all the materials in the debris piles are considered asbestos-containing waste material" that cannot be reused, (Najarian Dec. 2021 Report at 8–9). Najarian also compared the asbestos identified in Tiger Environmental's 2014 survey with the asbestos remediated in the July 2016 report and confirmed that asbestos "remained in many of the buildings after the June 2016 abatement efforts." (*Id.* at 9, 27–29.) Najarian's opinion is not merely "competing expert testimony," *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d 116, 190 (D.N.J. 2020), but rather persuasive indication that Petillo's reliance on the Tiger Environmental survey is not reasonable.

The Court likewise finds that the other sources Petillo points to were unreasonable for a purported demolition expert like Petillo to rely on. SB Building notes that during the demolition process, the air quality was monitored for asbestos. (ECF No. 195 at 11; *see also* Petillo Report at 5; Ex. E to Petillo Report; Hr'g Tr. at 594:20–25 ("Even during the actual demolition, air

monitoring was done.").) However, the fact that air testing showed no asbestos was in the air during demolition does not correspond to whether asbestos remained in the some 55,000 tons of debris which remain to date on the Property. The 2021 asbestos survey performed on the then existing buildings by Tiger Environmental, (ECF No. 195 at 11; Petillo Report at 5), has no relevance to the debris from the demolished buildings. As noted above, the testing performed by Finog Environmental in 2017 that Petillo cites evidently has no connection to the debris which remain, and Petillo was able to offer no tie between the testing documents included with his report and the Property. Finally, SB Building points to "[t]he absence of any testing of the debris by [the Agency] which shows the existence of asbestos in the demolition debris." (ECF No. 195 at 11.) However, the burden is on SB Building to establish that Petillo relied on reliable data, not on the Agency to prove otherwise. *See Viking Yacht Co. v. Composites One LLC*, 613 F. Supp. 2d 637, 640 (D.N.J. 2009) ("The burden is on the proponent of the testimony to prove its admissibility by a preponderance of proof." (citation omitted)).

Finally, as with Ritter, SB Building also moves to exclude Otteau's testimony to the extent he relied on Petillo's assumptions about the presence of asbestos. (ECF No. 189-1 at 12.) SB Building does not respond to this argument in its opposition brief. (*See generally* ECF No. 195.) Although he does not specifically acknowledge that he relies on Petillo's report as an extraordinary assumption, Otteau does write that "[p]er the demolition and site cost report of Ronald Petillo, dated May 1, 2022, most of this material can be recycled and reused in the development of the site." (Otteau Report at 28; *see also id.* at 101 ("[T]he Ronald Petillo expert report indicated that due to the value of the crushed material from the demolition would provide a net gain.").) Therefore, the Court grants the Agency's motion with respect to Otteau's testimony.

Because Petillo has no factual basis to assume that there are no ACMs within the debris on the Property, his opinion regarding the net value of the debris based on that assumption is unfounded and will be barred. Thus, the Court grants the Agency's Motion *in Limine*, (ECF No. 189), with respect to Petillo's opinion that there is no asbestos present in the demolition debris at the Property and Otteau's opinion to the extent it relies on this opinion of Petillo's.

### 3.    Testimony from David Zimmel

The Agency seeks to exclude the entirety of Zimmel's testimony on several grounds. (ECF No. 191-1.) The Agency argues that Zimmel does not support his opinions with any facts or data and simply employs broad statements and hyperbole to describe the New Jersey real estate market and his belief of the Property's value. (*Id.* at 4–8.) Moreover, the Agency argues that Zimmel cannot value the Property based on letters of intent to purchase it because offers or options to sell property are inadmissible evidence of value under New Jersey law. (*Id.* at 8–9.) Finally, the Agency contends that Zimmel is too biased to testify as an expert because of his close ties to SB Building's principal, Berger. (*Id.* at 10–11.)

SB Building responds that it intends to elicit two expert opinions from Zimmel: one regarding the robust strength of New Jersey's industrial real estate market at the date of valuation and one regarding the suitability of the Property for industrial and warehouse uses. (Hr'g Tr. at 27:1–5; ECF No. 197 at 1.) In response to the Agency's contention that Zimmel's report lacks "empirical" data, SB Building responds that Zimmel's opinion is founded on his 40 years of experience in the industry and involvement with over 2,000 commercial real estate transactions. (*Id.* at 1.) Regarding the letters of intent, SB Building admits that they are inadmissible to prove the value of the Property but contends that Zimmel can nonetheless rely on them to rebut the

Agency's evidence that the Property is not valuable warehouse space. (*Id.* at 5–6.) SB Building's brief does not address the Agency's arguments related to Zimmel's bias.

The Court finds that SB Building has not carried its burden to establish that Zimmel's two proposed opinions are based on adequate facts or data or reached through a reliable methodology. The Court must consider "all aspects of the expert's testing: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *ZF Meritor, LLC*, 696 F.3d at 291–92 (citation omitted). To establish that a methodology is reliable, the "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). Critically here, an expert opinion "is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded upon those facts." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996) (citing 1 McCormick on Evidence § 13 (1992)).

Zimmel's report offers no basis for his opinion that "this is the most extraordinary industrial real estate market that [Zimmel] ha[s] ever encountered." (Zimmel Report at 1.) To begin, Zimmel's report is undated, and at the hearing he was unable to state when he wrote it except that he is "pretty confident" it was in 2022. (Hr'g Tr. at 318:10–319:13.) Later he testified that he wrote it "probably a month or two before [his] deposition," (*id.* at 344:14–21), which was taken on August 1, 2023, (*id.* at 340:7–9).

Given the glaring absence of a date on the report and Ritter's uncertain and contradictory testimony as to even which year he authored it in, it is unclear what time period's real estate market the report refers to. Zimmel's report is silent as to any empirical data, studies, or analysis that support his opinions. (*See generally* Zimmel Report.) Nor did Zimmel explain in his report, or at any point during the hearing, how he reached his opinion. The most Zimmel discusses, generally,

were a "number of factors"—the pandemic, acquisitions by Amazon, increase in the cost of fuel, the timing of construction for new warehouses, and supply chain problems with products coming from China—that support his position. (*Id.* at 1–3.) Therefore Zimmel has not established that he has formed his opinion in reliance on sufficient facts or data under Rule 702. *See Kuhar v. Petzl Co.*, No. 16-0395, 2018 WL 6331682, at *4 (D.N.J. Dec. 4, 2018) ("In the absence of evidentiary support, an expert's testimony is of no assistance to the factfinder . . . ." (citation omitted)). Instead of firm grounding in "methods and procedures," Zimmel's report is based on "subjective belief or unsupported speculation." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Daubert*, 509 U.S. at 589).

SB Building cannot rectify this deficiency by backfilling facts and data into Zimmel's opinion during his deposition and hearing testimony. At the hearing, Zimmel testified that his knowledge is based on the involvement in the industrial real estate market over the past 40 years and his daily use of a commercial database that lists industrial properties for sale. (Hr'g Tr. at 324:20–325:18.) However, Zimmel cannot use this database in the present to generate a historical list of available properties with prices. (*Id.* at 328:17–329:18, 330:5–12.) While Zimmel testified that it would have been *possible* for him to generate this data at the time in 2022 or 2023, presumably, (*id.*), he made clear he is unable to do so in the present and that therefore his bare assertion that the warehousing market was strong in 2022 is unsupported by the requisite historical market pricing, *i.e.* "sufficient facts and data." Fed. R. Evid. 702. In contrast to Zimmel's three-page report, Sussman's and Otteau's reports provide the type of documentation an expert witness would need to explain pricing trends in a particular real estate market for a particular type of property at a particular point in time. (*See generally* Otteau Report, Sussman Report.)

Ritter's claimed reliance on pricing data from the commercial database likewise runs afoul of Federal Rule of Civil Procedure 26, which requires a party to disclose along with a witness's written report "the facts or data considered by the witness in forming" his opinion. Fed. R. Civ. P. 26(a)(2)(B)(ii). Zimmel did not review this data in forming his opinion, SB Building did not disclose any data with Zimmel's report, and Zimmel admittedly has no way to generate this data now. His vague testimony that he looked at property prices in the past does not show that Zimmel had adequate facts underlying his opinion, and Zimmel's failure to include these purported facts and data with his three-page report "is a material omission as it deprives [the Agency] of the means to determine the foundation for the opinion." *Audubon Eng'g Co. LLC v. Int'l Procurement & Contracting Grp. LLC*, 647 F. App'x 95, 99 (3d Cir. 2016) (citing Fed. R. Civ. P. 26(a)(2)(B)(ii)). For this additional reason, it must be barred.[34]

Because SB Building has failed to identify an admissible portion of Zimmel's report, the Court grants the Agency's Motion *in Limine* to exclude SB Building's expert report and testimony in full.[35]

**B.      SB BUILDING'S MOTION *IN LIMINE***

Through its single Motion *in Limine*, SB Building seeks to exclude certain categories of evidence—relevant to multiple witnesses' testimony—as well as exclude testimony from certain

---

[34] As to the Agency's arguments regarding Zimmel's bias, those are criticisms to be addressed on cross and do not provide a basis to exclude the testimony. *See Warren Distrib. Co. v. InBev USA L.L.C.*, No. 07-1053, 2010 WL 2179167, at *8 (D.N.J. May 28, 2010) ("[A]n allegation of bias that can be appropriately exposed on cross examination."); *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 166 n.11 (3d Cir. 1999) (Becker, C.J., dissenting) ("[E]xpert witnesses cannot be excluded on the basis of bias." (citations omitted)).

[35] At the hearing, the parties discussed at length whether Zimmel could testify as a fact witness, given that SB Building only identified him as a potential expert witness in the Final Pre-Trial Order. (Hr'g Tr. at 307:22–311:19, 313:10–314:24; *see also* ECF No. 171.) Because Zimmel's report only purported to offer expert testimony made no mention of the Property subject of this suit or Zimmel's history with it, (*see generally* Zimmel Report), the Agency only sought exclusion of Zimmel as an expert witness. Therefore, the Court only addresses the challenges to Zimmel's proposed expert testimony at this juncture.

witnesses on more traditional *Daubert* grounds. (ECF No. 188-12.) The Court addresses the broader categories of evidence first before turning to SB Building's witness-specific challenges.

### 1.    Evidence Related to the *Mount Laurel* Litigation

SB Building moves the Court to bar the Agency's witnesses from testifying that using the Property for residential development pursuant to the Redevelopment Plan is the only legally permissible use for the Property. (ECF No. 188-12 at 10–18.) SB Building contends that the Borough's purpose for acquiring the Property—to develop it to satisfy the Borough's *Mount Laurel* affordable housing obligations—cannot be considered under the "project influence" doctrine, which requires valuing the Property "disregarding either the depreciating threat of or the inflationary reaction to the proposed public project." (*Id.* at 10–12 (quoting *Jersey City Redevelopment Agency v. Kugler*, 277 A.2d 873, 875 (N.J. 1971)).) SB Building argues that instead, just compensation must be determined by taking into account any permissible use, including the industrial uses that remain in the underlying zoning. (*Id.* at 14.) Further, the Superior Court's orders in the *Mount Laurel* litigation bind the Borough, not SB Building. (*Id.* at 12.) Based on these arguments, SB Building moves to bar Sussman and Barree from testifying that development consistent with Superior Court orders is the only permissible use. (*Id.* at 14–18.)

The Agency responds that the "project influence" doctrine is not applicable here because the parties have not alleged or offered evidence that the "announcement of the redevelopment of the Subject Property or of its condemnation caused either an increase or decrease in the property's market value." (ECF No. 194 at 3–5.) The Agency refers to the redevelopment plan and the *Mount Laurel* litigation as "preexisting legal restrictions of which SB Building was fully aware," and argues that the *Mount Laurel* obligation (and the Master Plan put in place to effectuate it) are akin to a preexisting zoning restriction properly considered in valuation. (*Id.* at 5.) The Agency also

argues that because the Borough's constitutional obligations resulted from litigation that SB Building instituted, SB Building's attempt to value the Property as though the obligations did not exist reflects impermissible "gamesmanship." (*Id.* at 9–10.)

The Court agrees with SB Building that under the principles of just compensation, developing the Property in accordance with the Redevelopment Plan is not the sole legally permissible use for the Property. As discussed above, determining just compensation must account for whether "the use can be legally and physically achieved," *Borough of Saddle River v. 66 E. Allendale, LLC*, 77 A.3d 1161, 1174 (N.J. 2013), which in turn must account for "current zoning ordinances," *id.* at 1163. As Ritter and Barree agree, the Redevelopment Plan's overlay zoning did not displace the underlying zoning that allows for continued industrial use. (Ritter Report at 3 ("The [Redevelopment] Plan is an overlay and does not replace the underlying M-1 or B-2 zoning."); Barree 2019 Report at 6 (referring to the Redevelopment Plan's zoning as an "*optional overlay*" (emphasis added)); *see also* Hr'g Tr. at 690:10–14 (agreement by the Agency's counsel that the Borough could have amended the zoning ordinances to remove the industrial uses but chose not to).) Therefore, setting aside the need for a variance addressed above, using the Property for industrial purposes consistent with the underlying M-1 zoning is legally permissible.

The Agency's reliance on orders entered by the Superior Court in the *Mount Laurel* litigation misses the fundamental exercise the jury engages in to determine just compensation. Just compensation requires "an evidential construction of a *hypothetical* sale between a willing and uncoerced seller and a like-minded buyer." *New Jersey ex rel. State Highway Comm'r v. Burnett*, 131 A.2d 765, 769 (N.J. 1957) (citing 4 Nichols on Eminent Domain § 12.32 (3d ed. 1951)) (emphasis added); *see also New Jersey ex rel. Comm'r of Transp. v. Carroll*, 587 A.2d 260, 269 (N.J. 1991) ("[J]ust compensation should be regarded from the point of view of the owner and not

the condemnor." (quoting *Comm'r of Transp. v. William G. Rohrer, Inc.*, 404 A.2d 29 (N.J. 1979)). The *Mount Laurel* litigation orders do not bind a hypothetical buyer but rather one specific buyer, the Borough.

The Agency cites no authority for its contention that a constitutional obligation placed on the Borough itself—rather than on the Property or its owner—is relevant to the jury's determination of the Property's highest and best use. The *Mount Laurel* line of cases makes clear that the constitutional obligation falls to the municipality, not on specific properties or property owners. *See S. Burlington Cnty. N.A.A.C.P. v. Mount Laurel Twp.*, 336 A.2d 713, 728 (N.J. 1975) ("[T]he presumptive obligation arises *for each such municipality* affirmatively to plan and provide . . . the reasonable opportunity for an appropriate variety and choice of housing . . . ." (emphasis added)); *S. Burlington Cnty. N.A.A.C.P. v. Mount Laurel Twp.*, 456 A.2d 390, 421 (N.J. 1983) (discussing the efforts of "municipalities to meet their obligations" under the *Mount Laurel* doctrine). It makes little sense under the fundamental principles of just compensation for a property to be valued less based on whether the condemning municipality is deficient in its fair share housing obligations, has been found by a court to be deficient, or has other available land in town it could use to build affordable housing.[36]

Further, permitting the jury to value the Property for industrial uses would not contravene the Superior Court's orders in the *Mount Laurel* litigation. (ECF No. 194 at 6, 9.) Judge Hurley's 2011 Order recognized the Borough's inadequate affordable housing and found that the remedy was "to compel Milltown to amend its redevelopment plan to provide for a specific number of

---

[36] The Court's decision in no way ignores the importance of the *Mount Laurel* line of cases, which, as the Agency correctly points out, "are a matter of constitutional imperative and a fundamental part of land use regulation." (ECF No. 194 at 7 (citing *S. Burlington Cnty. N.A.A.C.P.*, 336 A.2d at 713).) However, excluding consideration of the Borough's constitutional obligation ensures that the property owner receives the constitutionally-required "just compensation" while also doing nothing to prevent the Borough from eventually using the Property to build affordable housing.

affordable units." (2011 Super. Ct. Op. at 14.) In compliance with the Superior Court's order, the Borough amended its Redevelopment Plan. If after the taking were carried out, the Borough permitted the Property to be developed without any set aside for affordable housing, that may well, as Barree writes, "contravene" the Superior Court orders and "plac[e] the Borough's ability to provide its fair share obligation in jeopardy." (Barree 2023 Report at 7.) However, the fact that the jury may value the Property without consideration of the Borough's constitutional obligations does not prevent the Borough from subsequently complying with them. The jury's valuation accounts for the Property's most valuable use, not the actual use to which it is put, even where the condemnor's actual use will be worth less than a buyer's use in a hypothetical sale.

Nor does it matter that, as the Agency argues, (ECF No. 190-1 at 28 n.5), that Berger instituted the builder's remedy that led to the 2011 decision recognizing the Borough's *Mount Laurel* obligations. It may be true that Judge Hurley was openly critical of Berger's motivations for bringing the builder's remedy actions, (2011 Super. Ct. Op. at 10–11), and that SB Building's instigation of the builder's remedy suit was the only reason a court had the opportunity to consider whether the Borough was in violation of its fair share housing obligation. Nonetheless, the Borough's obligations ultimately stem from the New Jersey Constitution, not SB Building.[37]

Therefore, the Court grants SB Building's Motion on this point, barring evidence of the Borough's *Mount Laurel* obligations and barring the experts from testifying that the sole legal use of the Property is to build affordable housing in compliance with the Borough's *Mount Laurel* obligations.[38]

---

[37] In light of this resolution, the Court need not address the parties' arguments regarding the project influence doctrine, which the parties' briefing discusses at some length.

[38] This would preclude the Agency's experts from testifying that building affordable housing is the highest and best use of the Property—it would just prevent them from testifying that that is the *only* legal use of the Property. The Agency remains free to argue that residential development in conformity with the Redevelopment Plan is the "maximally productive" use for the Property. *Suydam*, 826 A.2d at 684 (citation

## 2.    Evidence Related to the Variance Requirements

Next, SB Building seeks the Court to interpret the Borough's ordinances and New Jersey's land use laws in a way that bars the Agency's witnesses from giving certain testimony. SB Building moves to bar any testimony that the warehouse use for the existing buildings on Parcel 3 cannot be continued without receiving a parking variance. (ECF No. 188-12 at 19–21.) Relatedly, SB Building argues that the Agency's witnesses should not be permitted to testify that Parcel 2 and Parcel 3 cannot be subdivided without expanding the preexisting nonconforming parking deficiency on Parcel 3. (*Id.* at 21–22.) Finally, SB Building objects to any testimony that Parcel 2 cannot be developed based on the parking nonconformity on Parcel 3. (*Id.* at 22–23.) The Agency opposes each position, arguing that SB Building fails to establish that the Parcel 3 parking deficiency is a preexisting nonconforming condition and that Ritter's proposal for the Property, subdividing it into smaller parcels, would constitute an impermissible expansion of the nonconforming condition. (ECF No. 194 at 11–18.)

The parties' arguments on these points mirror the arguments raised and addressed in the Agency's Motion to limit Ritter's testimony under *Saddle River*, *see* Section III.A.1, briefly recounted here. Subdivision is necessary to carry out Ritter's plan for the Property. Ritter's Report and testimony repeatedly contemplate subdivision in order to implement his plan. (Ritter Report at 3–5; Ritter Dep. at 39:22–40:2.) Ritter agreed that if he sought a parking variance for his proposal for both Parcel 2 and Parcel 3 together, the variance would have to be granted "based on the entire tract," (Hr'g Tr. at 266:8–19), explaining why Ritter proposes subdividing the Property in order to address the parking deficiencies on each parcel separately. SB Building's footnote

---

omitted). Moreover, that an industrial use is legal does not resolve whether the Borough would grant the requisite variances for any industrial use.

response is that Ritter's proposal could take place on an unsubdivided lot because Borough ordinance permits "more than one building on a lot: for an industrial complex." (ECF No. 188-12 at 22 n.8 (quoting Milltown Code § 34-33.19).) However, the problem with attempting to effectuate Ritter's proposal without subdivision is not the existence of multiple buildings on one lot—which clearly is allowed—but rather the fact that Ritter proposes seeking a parking variance for *only* Parcel 2 (rather than the entire tract) and claims that the parking deficiency for the existing buildings is a preexisting nonconforming condition for *only* Parcel 3 (rather than the entire tract).

Attempting to subdivide the Property to consider Parcel 2's and Parcel 3's parking deficiencies would expand the preexisting nonconforming condition on Parcel 3. Currently, the Property contains 170,000 square feet of warehouse space and 22.4 acres available for parking. Ritter agrees that the vehicles parked on both Parcel 2 and Parcel 3 may well belong to tenants of the buildings on Parcel 3. (*See* Hr'g Tr. at 267:23–268:1.) Ritter's ambivalence on this point is supported by Otteau's statement that parking for the Parcel 3 buildings extends to Parcel 2. (Barree 2023 Report at 8 ("There is evidence that the current operations extend haphazardly from the developed portion of the property into the areas where demolition has already occurred.").) SB Building asserts in its brief that the buildings on Parcel 3 "do not, and have never, met the parking requirements subsequently enacted in the M-1 zone" and that "[f]or decades, the existing buildings have been occupied using only approximately 45 parking spaces along with the requisite loading maneuvering areas for truck traffic." (ECF No. 188-12 at 20.) However, SB Building points to no evidence supporting its claim that the parking for the 170,000 square feet of warehouses has been strictly contained within Parcel 3, and therefore SB Building fails to establish that the current condition is a preexisting nonconforming condition.

Milltown's ordinance prohibits subdivision that makes a nonconforming condition "more nonconforming in any manner." (Milltown Code § 34-33.16.) As the Superior Court, Appellate Division held in *Razberry's*, "reduc[ing] the size of the property occupied by a nonconforming use may result in a substantial increase in the nonconformity." 593 A.2d at 1266. This rationale was applied to the "highest and best use" analysis in *Tamburelli Props. Ass'n v. Borough of Cresskill*, where the Appellate Division affirmed the trial court's decision excluding testimony that the highest and best use for a 30-acre plot was to develop it into 24 one-acre residential lots while maintaining a preexisting nonconforming clubhouse as a catering business on the remaining 6 acres. 705 A.2d 1270, 1272 (N.J. Super. Ct. App. Div. 1998). The Superior Court held that testimony that the nonconforming clubhouse could continue to operate on a smaller parcel of land was properly excluded because "the reduction in lot size . . . constituted an expansion of a nonconforming use by increasing the intensity of use on the remaining smaller lot." *Id.* (citing *Razberry's, Inc.*, 593 A.2d at 1264). By reducing the land over which the parking deficiency is potentially spread from both Parcel 2 and Parcel 3 to only Parcel 3, the nonconforming parking condition here, like the nonconforming clubhouse use in *Tamburelli*, is expanded.

Therefore, SB Building's three requests to bar testimony as described above are denied. While the continued warehouse use on Parcel 3 is consistent with the underlying zoning, a parking variance would be required to subdivide the Property. SB Building's motion to bar testimony on this ground, (ECF No. 188-12 at 19–21), is denied. Because the Court finds that subdividing the Property will expand the preexisting nonconforming parking deficiency on Parcel 3 by reducing the amount of available parking space used by the 170,000 square feet of warehouse, SB Building's motion on this ground, (*id.* at 21–22), is denied as well. Finally, SB Building's request to bar testimony that Parcel 2 cannot be developed as Ritter proposes in light of Parcel 3's parking

deficiency, (*id.* at 22–23), is denied, as the parking deficiency on Parcel 3 may need to be addressed using parking space available on Parcel 2.[39]

### 3.    Evidence Related to the Costs of Remediation

SB Building next moves to exclude "all evidence of the existence of environmental contamination at the Subject Property that may impact the fair market value." (ECF No. 188-12 at 32.) SB Building contends that under *Hous. Auth. of New Brunswick v. Suydam Invs., L.L.C.*, 826 A.2d 673 (N.J. 2003), a contaminated property must be valued as though it were already remediated. (*Id.* at 29.) This prevents the possibility of a "double-take," which could occur if the Property's value were discounted once during the condemnation proceeding and then SB Building were held liable for environmental discharge in subsequent litigation. (*Id.* at 29–30.)

The Agency responds that *Suydam* is distinguishable because *Suydam*'s result turns on whether the condemnee actually faced subsequent statutory liability. (ECF No. 194 at 23–24.) The Agency contends that here, the evidence it seeks to admit relates to asbestos contamination of "the demolition debris or the existing buildings." (*Id.* at 26.) Because the contamination is in debris and structures rather than the Property's soil or water, the contamination is not a "discharge" under the environmental liability statutes. (*Id.* at 24.) Because SB Building is not subject to liability in a secondary suit, evidence of the contamination and associated costs should not be excluded here. (*Id.* at 26.)

In *Suydam*, the New Jersey Supreme Court held that "where property is contaminated, the condemnor should appraise as if remediated." 826 A.2d at 687. The Court recognized that "several

---

[39] Regarding this final argument, SB Building writes that the Agency's "experts have stated that any hypothetical development on the vacant 14 acre portion of the Subject Property would not be approved by the Borough's Planning Board without first requiring the property owner to cure the parking nonconformity with respect to the existing 170,000 square feet of industrial building on the Subject Property." (*Id.* at 22.) The Court separately notes that SB Building does not point to any portion of any witness testimony where the Agency's experts take this position, and it is not clear to the Court that they did so at any point.

federal and State statutes impose liability on present and past owners of real property for the discharge of hazardous substances" and focused on the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J. Stat. Ann. § 58:10-23.11 to -23.50, as representative of these statutes. *Id.* at 682. The Court explained its concern:

> To us, the major issue is the reality of a condemnee's liability under the Spill Act and like statutory initiatives. When property is devalued for contamination in condemnation, landowners first receive discounted compensation in the condemnation proceeding and then are subject to the full cleanup costs, thus suffering what is colloquially denominated as a "double-take." Under that scheme, the condemnor receives a windfall by ultimately obtaining the property in a remediated state at the condemnee's cost, yet paying a discounted price due to the contamination.

*Id.* at 686 (citations omitted). Valuing property this way can also ensure that property is not valued below its "highest and best use" because valuing a property in "its contaminated state will necessarily circumscribe its uses." *Id.* at 686. The Court also recognized the "difficulty of estimating the value of contaminated property" that could interfere with the otherwise "relatively straightforward notion" of valuation. *Id.*

However, *Suydam* does not require that all evidence of asbestos contamination on any portion of a condemned property be categorically barred. In *New Jersey Sch. Const. Corp. v. Warminster Invs. Corp.*, the Superior Court, Appellate Division distinguished *Suydam* where the contamination existed only in buildings on the property, rather than in the ground. No. A-5319-07T1, 2009 WL 3429670 (N.J. Super. Ct. App. Div. Oct. 16, 2009). "For purposes of a fair value proceeding, contamination in a building . . . is not the equivalent of discharging a contaminant into the environment." *Id.* at *4. The court observed that the analysis under *Suydam* turned on whether the contamination exposed the condemnee to future liability. *Id.* The court explained that under the Spill Act, "pouring of hazardous waste on the ground was a discharge" but "placement of the

waste stored in containers was not a discharge" creating the potential for liability. *Id.* at *5. While the Court is mindful that the Appellate Division case is unpublished and does not cite for precedential value, the Court finds its reasoning persuasive and adopts its reasoning as its own.[40] The Appellate Division explained:

> We view the asbestos and lead that are present in [the condemnee's] building as no different from stacks of tires, rusted cars, paint cans, batteries or other environmentally-offensive items that have not created run-off or discharge, but which nonetheless must be removed from a property prior to sale. Just as the removal cost of those items would be properly considered by a jury in determining fair value, the costs of lead and asbestos abatement should likewise be admissible. What differentiates [the condemnee's] position from that of the condemnee in *Suydam* is "the reality of a condemnee's liability under the Spill Act and like statutory initiatives," and the Court's focus on the potential for a "double-take" whenever cost-recovery proceedings under environmental statutes are likely to ensue."

*Id.* at *5 (citing *Suydam*, 563 A.2d at 682–84). The court concluded that the lead paint and asbestos in the building at issue "are in a fixed position and have not been discharged into the environment" and are therefore "the equivalent of waste stored in containers." *Id.* at *5. Having framed the issue through *Suydam* and *Warminster*, the Court turns to SB Building's arguments here.

SB Building seeks broad exclusion of "all evidence of the existence of environmental contamination at the Property." (ECF No. 188-12 at 32.) Although SB Building does not separately discuss any specific evidence of contamination, the Court first considers contamination from

---

[40] *See* N.J. Ct. R. 1:36-3 ("No unpublished opinion shall constitute precedent or be binding upon any court."). However, federal courts are free to cite unpublished state court decisions for illustrative purposes in their interpretation of state law. *See Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 152 (3d Cir. 1988) ("The New Jersey rules are, of course, binding only on the New Jersey courts, and we would be remiss in our duty to apply New Jersey law were we to ignore a New Jersey case where the relevant issue is identical."); *see also Reid v. Transportation Ins. Co.*, 502 F. App'x 157, 160 (3d Cir. 2012) (affirming district court's reliance on unpublished New Jersey court opinion where the court "explicitly acknowledged that [it] was an unpublished decision").

asbestos in the demolished and remaining buildings, and then considers the contamination from PCBs in the ground.

Beginning with asbestos, the Court finds *Suydam*'s valuation procedure does not apply to evidence regarding asbestos contamination at the Property. At the outset, the Court notes that SB Building has not explained *how* it could subsequently be liable under any environmental statutes. In *Suydam*, the condemnee did not face a tentative possibility of future liability, as the New Jersey Supreme Court wrote instead that the "major issue is the *reality of* a condemnee's liability under the Spill Act and like statutory initiatives." *Suydam*, 826 A.2d at 686 (emphasis added). As a subsequent appellate panel explained based on this language, "[i]f . . . the condemnee is not subject to any additional liability for remediation, . . . the special valuation methodology established in [*Suydam*] does not apply." *Borough of Paulsboro v. Essex Chem. Corp.*, 47 A.3d 48, 53 (N.J. Super. Ct. App. Div. 2012) (holding that *Suydam* did not apply where a site has "already been remediated with the [NJDEP's] approval"). The Court therefore looks to whether "cost-recovery proceedings under environmental statutes are *likely to ensue*" after this condemnation proceeding, *Warminster*, 2009 WL 3429670, at *5 (emphasis added) (citing *Suydam*, 826 A.2d at 686), in which case *Suydam* applies.

Aside from sheer predictive speculation, SB Building has not demonstrated under any standard the prospect that it faces suit under the Spill Act. The Court finds no basis here to conclude that SB Building may face subsequent liability for the potential asbestos contamination at the Property. In the section of its brief devoted to this issue, SB Building summarizes *Suydam*'s holding and rationale in depth but does not apply it to the facts in the case at bar. (*See* ECF No. 188-12 at 28–32.) SB Building mentions the Spill Act and the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 to 9675, but does not discuss their

language, the facts of this case, or which statutory provision of the Spill Act or any other statute exposes SB Building to liability.[41] The absence of any discussion of the Spill Act prevents the Court from determining whether subsequent proceedings are "likely to ensue." *Warminster*, 2009 WL 3429670, at *5.

Without guidance from the parties, the Court briefly reviews the language of the Spill Act that could expose SB Building to liability for the asbestos at the Property.[42] The Spill Act imposes strict liability on a property owner "'who has discharged, . . . or is in any way responsible' for the discharge of any hazardous substance." *Suydam*, 826 A.2d at 683 (citing N.J. Stat. Ann. § 58:10–23.11g–c(1)). A "discharge" is "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances *into the waters or onto the lands* of the State . . . ." N.J. Stat. Ann. § 58:10–23.11b (emphasis added). However, contamination by itself does not mean there has been a "discharge." "[A] discharge is some action resulting in an environmental effect caused by an interaction with the environment. Contamination is not such an action but it is the result." *Atl. City Mun. Utilities Auth. v. Hunt*, 509 A.2d 225, 237 (N.J. Super. Ct. App. Div. 1986).

Here, the parties have presented some level of evidence of asbestos contamination in both the existing 170,000 square feet of warehouse buildings (on Parcel 3) and the comingled debris from the demolished buildings (on Parcel 2). Both Petillo and Najarian cite Tiger Environmental's

---

[41] The Agency likewise does not offer clarity on the likelihood that SB Building would face liability under the Spill Act, citing *Warminster* and writing simply that "the presence of asbestos in the construction debris and existing buildings is not the equivalent of discharging a contaminant into the environment." (ECF No. 194 at 26 (emphasis in original).) However, as SB Building is the party seeking the Court to bar otherwise relevant valuation evidence under *Suydam*, the Court looks to SB Building to explain how it may face liability.

[42] The Court only reviewed the language of the Spill Act, which *Suydam* called "archetypical of many environmental statutes." 826 A.2d at 683. To the extent SB Building contends that it faces liability for asbestos contamination under any statute, the Spill Act or otherwise, the Court looks to SB Building to cite that statute and explain why it triggers *Suydam*'s protections.

2021 survey of the buildings on Parcel 3 that found "presumed or known" asbestos in 20,000 square feet of roofing material in one of the buildings. (Ex. E to Petillo Report; *see also* Petillo Report at 5; Najarian Dec. 2021 Report at 6.) While the parties' witnesses disagree whether asbestos containing materials remain in the debris from the buildings on Parcel 2 that Petillo demolished in 2016 and 2017, (*compare* Petillo Report at 6, *with* Najarian Dec. 2021 Report at 8–9), the Court presumes it is highly likely for the purpose of SB Building's *Suydam* argument that asbestos is present in the debris.

However, SB Building has not established that either the asbestos in the standing buildings or the debris piles in the demolished buildings are "discharge" under the Spill Act. The asbestos in the standing buildings on Parcel 3 are precisely like the "the asbestos and lead that are present in [the condemnee's] building" in *Warminster*, 2009 WL 3429670, at *5. Because the asbestos would have to be removed by a licensed contractor from the structures before they could be demolished, (Hr'g Tr. at 606:19–607:8), there has been no "environmental effect caused by an interaction with the environment." *Hunt*, 509 A.2d at 237. If there is asbestos present in the comingled debris piles on Parcel 2, it likewise does not constitute discharge under the Spill Act. Instead, the asbestos in the debris is like "stacks of tires, rusted cars, paint cans, batteries or other environmentally-offensive items that have not created run-off or discharge, but which nonetheless must be removed from a property prior to sale." *Warminster*, 2009 WL 3429670, at *5. At the property in *Suydam*, there was asbestos contamination, but it stemmed from asbestos revealed through "soil sampling." *Suydam*, 826 A.2d at 678. In contrast here, SB Building points to no evidence from either party suggesting that the asbestos is in the soil. If it turns out there are contaminants in the soil and SB is potentially liable under the Spill Act, there's no double recovery because only the amount of removal of *above-ground* contaminants will be presented to the jury.

This outcome is supported by each party's proposal developing Parcel 2. Both parties' highest and best use analysis contemplates developing Parcel 2—either for more warehouse space (SB Building) or for mixed residential development (the Agency). Both parties' proposals require addressing the debris piles currently on Parcel 2. However, their proposals differ as to whether the debris can be reused at the site or whether it must be carted off for disposal because of interspersed asbestos. Thus, the parties' disagreement over the evidence of asbestos contamination turns not on the value of the Property as may be affected by transaction costs to remediate asbestos in the soil—in which case *Suydam*'s rationale would apply—but rather on how much it would cost to carry out each party's development proposal to achieve the Property's highest and best use. [43]

Because SB Building has not put forward any evidence of the prospect of subsequent liability under the Spill Act for asbestos at the Property, it faces no risk of an unconstitutional double-take and *Suydam*'s requirement to bar evidence of contamination does not apply. The Court, of course, is not rendering an advisory opinion regarding any future liability as to SB Building under the Spill Act or any other statute regarding potential contamination not yet known, only that at present any prospect of such litigation is pure speculation.

In comparison, the Court finds that any evidence of PCBs on the Property must be excluded. Gunawardana testified that PCB contamination can result from the presence on the Property of items like transformers, which were historically associated with PCBs. (Hr'g Tr. at 506:21–507:5; *see also* Najarian Dec. 2021 Report at 6.) Najarian conducted concrete core sampling and testing in 2006 or 2007, which resulted in findings that several samples had PCB levels that exceeded the regulatory limits. (Hr'g Tr. at 526:10–20; Najarian Dec. 2021 Report at

---

[43] SB Building cites other policy reasons supporting the outcome in *Suydam* that require the same result here. (ECF No. 188-12 at 30–34 (citing *Suydam*, 826 A.2d at 686–87).) However, these justifications for *Suydam*'s procedures are not triggered where there is no danger of subsequent litigation.

7.) In its brief, the Agency admits that there are pending environmental proceedings by the NJDEP against SB Building's related entities seeking to impose "clean-up costs for PCB discharges" on the property. (ECF No. 194 at 26.)[44] The existence of actual pending proceedings against a condemnee under the Spill Act—as compared to conclusory allegations that a condemnee may face Spill Act liability—militates in favor of *Suydam*'s application.

Indeed, the Agency's brief could be read to implicitly agree that evidence of PCB contamination must be excluded under *Suydam*. The sole reference to PCBs in the Agency's brief reads: "While there are pending environmental proceedings filed by the NJDEP against Mr. Berger's various entities seeking to impose clean-up costs for PCB discharges on the property, those actions do not involve the asbestos contamination of the demolition debris or the existing buildings." (ECF No. 194 at 26.) By focusing its response on asbestos and distinguishing asbestos from PCBs, the Agency appears to tacitly agree with SB Building's position with respect to PCBs.

Because SB Building may be held liable under the Spill Act for PCBs in the Property's soil and water, *Suydam* requires that the jury not hear any evidence of PCB contamination at the valuation trial.[45]

---

[44] The Agency provides no further detail about the NJDEP's suit or its current status. From the Court's independent review, the case appears to be brought by the NJDEP against SB Building, Berger, and other entities based on "the demolition of three electrical transformers" in 2016 by COBRA Enterprises that discharged "an unknown amount of transformer oil containing [PCBs] . . . onto the Property and into nearby waterways." Compl., *N.J. Dep't of Env't Prot. vs. SB Milltown Indus. Realty Holdings, L.L.C.*, No. MID-L-002227-23 ¶ 2 (N.J. Super. Ct. Law Div. Apr. 20, 2023).

[45] Having found that evidence of the PCBs must be excluded, the Court notes that *Suydam* does not instruct that the cost of remediation be ignored wholesale. Instead, the Property must be valued as though the PCB contamination were remediated and the estimated cost of remediation must be deposited with the Court, only to be withdrawn once cleanup costs are finally determined. *Suydam*, 826 A.2d at 687–88 (citing 7A Nichols on Eminent Domain § 13B.03(4) (3d ed. 2002)); *see also Twp. of Haddon v. Morgan Bros.*, No. A-6605-06T3, 2008 WL 4735879, at *2 (N.J. Super. Ct. App. Div. Oct. 30, 2008) ("Once the remediation is concluded, the condemnor is reimbursed for the cost of remediation from those monies being held in court.").

### 4.      Testimony from John Barree and Mark Sussman

SB Building objects to several aspects of Barree's and Sussman's testimony. The primary objections stem from SB Building's broad challenge to any testimony about variances and subdivisions needed for the Property, the Redevelopment Plan and Superior Court orders, and the possible costs of environmental remediation. (ECF No. 188-12 at 8–9.) These objections are addressed in Sections III.B.1–3, *supra*, and therefore the Court does not separately address their application to Barree and Sussman.

Next, SB Building objects to Barree forming an opinion on the Property's "highest and best use" because this phrase has a "technical" meaning in the appraisal field. (ECF No. 188-12 at 35.) SB Building moves to exclude this testimony under Federal Rule of Evidence 403 on the grounds that Barree is not a "qualified expert" in appraisals and his opinion would mislead the jury in determining just compensation. (*Id.* at 35–36.) The Agency responds that Barree may use the term "highest and best use" because that concept encompasses the elements of physical possibility and legal permissibility, which Barree, as a planner, is qualified to opine on. (ECF No. 194 at 35.)

The Court agrees with SB Building that Barree should be barred from forming an ultimate opinion on the Property's highest and best use. While SB Building cites Rule 403, its objection to Barree's qualifications also raises a challenge under Rule 702. It is well established that the four elements relevant to a "highest and best use" analysis are "1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive." *Suydam*, 826 A.2d at 684 (quoting *Hilton*, 760 A.2d at 789). Based on his extensive professional planning credentials, Barree is qualified to testify regarding the legal permissibility or physical possibility elements, which SB Building acknowledges. (ECF No. 188-12 at 35–36 ("A planning analysis might be relevant to analyze the first 2 criteri[a].").) However, as Barree himself agrees in describing the highest and

best use test, the "final value analysis brings together a variety of factors and is conducted by a qualified appraiser. Planning analysis focuses primarily on parts 1 and 2, with some consideration to part 3." (Barree 2023 Report at 22.) Barree has no appraisal expertise, (Hr'g Tr. at 79:24–80:6), and the Agency offers no basis to permit Barree to apply all four elements necessary for the highest and best use analysis. Therefore, the Court finds that Barree does not "possess[] specialized expertise," *In re Human Tissue Prods. Liab. Litig.*, 582 F. Supp. 2d 644, 655 (D.N.J. 2008) (citation omitted), necessary to testify what the highest and best use of the Property is.[46]

Finally, SB Building objects to Barree referencing unadjudicated tickets or summonses issued to SB Building by the Borough for violations at the Property. (ECF No. 188-12 at 36–37.) SB Building argues that the issuance of the summons is irrelevant to valuation and that even if it had some probative value, it is substantially more prejudicial than probative because they are intended to "improperly deflate the value of the property" to the jury. (*Id.* (citing Fed. R. Evid. 402, 403).) The Agency responds that the summonses are probative because Barree relies on them for his rejection of Ritter's claim that the parking deficiency on Parcel 3 is a preexisting nonconforming condition. (ECF No. 194 at 37.) The Court finds that the summonses meet the low threshold for relevant evidence. *See* Fed. R. Evid. 401(a). Nor has SB Building met the high bar to establish that the danger of prejudice in the jury hearing that SB Building has been cited for conditions at the Property substantially outweighs any probative value. *See* Fed. R. Evid. 403. To the extent SB Building challenges the validity of the summonses' complaints or the motive behind their issuance, it may explore that issue through questioning at trial.[47] The Court will consider

---

[46] This does not bar Barree from mentioning the highest and best use test in the context of explaining why he looked to the possible legal and physical uses of the Property. Nor does it prevent Sussman from forming an opinion as to the highest and best use. However, Barree will not be permitted to apply all four elements of the test to conclude what the highest and best use is.

[47] SB Building moves generally to exclude "[e]vidence which is beyond the scope of the qualifications of Mr. Barree as a professional planner." (ECF No. 188-12 at 9; *see also id.* at 38.) SB Building does not

giving a limiting instruction at trial with input from counsel as to how the jury may consider the issuance of the various summons.

### 5.  Testimony from Najarian

SB Building moves to exclude Najarian's opinions that SB Building argues are inadmissible net opinions. (ECF No. 188-12 at 33–35.) SB Building contends that while Najarian may identify *potential* sources of contamination, the expert did not test the debris and therefore any opinion that it is definitively contaminated is an impermissible net opinion. (*Id.*) Further, SB Building objects to the portions of Najarian's reports in which Najarian's engineer was purportedly able to identify asbestos-contaminated debris at the Property by sight. (*Id.* at 34.) [48]

The Agency responds that Najarian adequately establishes a basis for its opinions that the debris may contain asbestos. (ECF No. 194 at 28–33.) Per the Agency, Najarian identifies "deficiencies" in prior contamination testing at the Property, on which Petillo relies, which "undermine the accuracy and reliability of [SB Building's] assertion that the ACM was remediated and that the demolition debris is not contaminated and can be used as 'clean' construction fill." (*Id.* at 31–32.)

The Court finds that Najarian has provided adequate foundation for the opinion that the debris at the Property cannot be crushed up and re-used on-site due to the presence of asbestos in the debris. The net opinion rule requires an expert to provide the "why and wherefore" of an opinion, *Curtis v. Besam Grp.*, No. 05-2807, 2007 WL 3232589, at *7 (D.N.J. Oct. 31, 2007)

---

develop this argument beyond the bases described above, and the Court therefore does not address it. *See John Wyeth & Brother Ltd. v. Cigna Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing . . . but not squarely argued, are considered waived." (citation omitted)).

[48] SB Building moves to bar Najarian's witnesses from testifying about both asbestos and PCBs at the Property under the net opinion rule. (ECF No. 188-12 at 34–35.) However, because the Court bars testimony about PCBs under the *Suydam* doctrine, it need not consider the net opinion challenge to Najarian's opinions regarding PCBs.

(citation omitted), rather than mere "bare conclusions, unsupported by factual evidence," *W. Am. Ins. Co. v. Jersey Cent. Power & Light Co.*, No. 03-6161, 2008 WL 5244232, at *5 (D.N.J. Dec. 15, 2008) (citation omitted). SB Building argues that Najarian violates the net opinion rule by only testifying that asbestos "may possibly be in the building ruble" without being able to say so definitively. (ECF No. 188-12 at 34.)

In leveling this objection, SB Building overlooks the causal chain Najarian creates to form its opinion. It is undisputed that before Petillo demolished the buildings on Parcel 2, testing revealed that they contained asbestos. (Hr'g Tr. at 590:23–591:11; Ex. E to Petillo Report.) The heart of Petillo's opinion is that based on documents he was provided and the procedure he followed, he believes that all asbestos found in the buildings was remediated and is not present in the debris. (Petillo Report at 5–6.) In response, Najarian identifies "deficiencies" in the procedures Petillo purportedly followed and the evidence he relies on for his opinion. (Najarian Dec. 2021 Report at 8–11.) Najarian is methodical in addressing and undermining each basis for Petillo's opinion, explaining why the documents Petillo relies on do not stand for the propositions Petillo cites them for and why the procedure Petillo purportedly followed does not offer the assurances Petillo claims. (*Id.*) Najarian concludes that the evident "intermixing of ACM with the building rubble greatly reduces the ability to separate and categorize the post-demolition debris, thereby preventing the onsite use of the materials and prohibiting offsite recycling." (Najarian Jan. 2023 Report at 9.) While not based on affirmative testing of materials at the site, Najarian's opinion is not a "bare conclusion[], unsupported by factual evidence." *Buckelew v. Grossbard*, 435 A.2d 1150, 1156 (N.J. 1981). Rather, the Court can clearly follow the "causal connection" between the facts Najarian cites and ultimate conclusion about asbestos in the debris.[49]

---

[49] The Court disagrees with SB Building's characterization of Najarian's opinion that its engineers can identify asbestos "visually, at a distance, without any testing or application of any scientific methodology

Therefore, the Court finds that Najarian's opinion regarding the contamination in the debris and its effect on the cleanup costs is not a net opinion but rather based on the "methods and procedures" of their expertise. *In re Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590).[50]

---

[50] or analysis." (ECF No. 188-12 at 34.) Najarian's reports do not make this claim. Rather, as explained above, Najarian reviewed the reports summarizing the history of demolition and remediation at the Property and found that they failed to show successful remediation. Najarian's engineer observed "[n]umerous [*potential* ACMs] . . . during multiple site inspections in the remnants of buildings and in the debris piles that are currently on-site." (Najarian Dec. 2021 Report at 10.) Observing these potential ACMs confirmed Najarian's belief that the asbestos was not successfully remediated. Further, Gunawardana confirmed at the hearing that it was impossible to determine definitively whether potential ACMs in fact contained asbestos particles. (Hr'g Tr. at 543:2–544:8.)

[50] SB Building also moves generally to strike portions of Najarian's report which contains inadmissible hearsay, contains a net opinion, or is beyond the scope of Najarian's expertise. (ECF No. 188-13 at 3.) However, SB Building is required to develop its arguments further. *See John Wyeth & Brother Ltd.*, 119 F.3d at 1076 n.6 ("[A]rguments raised in passing . . . but not squarely argued, are considered waived." (citation omitted)). Since it is not clear here which portions of the Agency's experts' testimony SB Building challenges beyond those grounds addressed above, the Court does not address these general objections.

**<u>CONCLUSION</u>**

For the reasons set forth above, SB Building's Motion *in Limine*, (ECF No. 188), is

**GRANTED** in part and **DENIED** in part; the Agency's Motions in *Limine*, (ECF Nos. 189, 190),

are **GRANTED** in part and **DENIED** in part; and the Agency's final Motion in *Limine*, (ECF No.

191), is **GRANTED**. An appropriate Order accompanies this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

<u>Dated</u>: August 7, 2024

84